RETIRED CHICAGO POLICE ASSOCIATION, an Illinois not-for-profit corporation, individually and on behalf of its members and other individuals who are participants in the City of Chicago's Annuitant Healthcare Plan, and whose participation began after 1987, but prior to August 23, 1989, Katherine Ryan, Bernard McKay, and Joseph Coglianese, for themselves and for others similarly situated as participants in the City of Chicago's Annuitant Healthcare Plan whose participation began prior to January 1,

1988, and the Retired Chicago Police Association, an Illinois not-for-profit corporation, individually and on behalf of its members and other individuals who are members of the 1987 class, Plaintiffs–Appellants,

and

Thomas J. Ahlfeld, Ignazio Bontempo, Patrick J. Boyle, Donald M. Jacobson, Michael Monaghan, Arthur Papineau, Lawrence J. Thomas, Bob Valleyfield, William L. Tlapa, Stanley C. Lis, Benedict J. Scacchiti, Arthur T. Cholly, William Danaher, and the Coalition of Active and Retired Employees Political Action Committee, also known as C.A.R.E.P.A.C., Appellants,

v.

CITY OF CHICAGO, a municipal corporation; Richard M. Daley, Mayor of the City of Chicago; Miriam Santos, Treasurer of the City of Chicago; Walter Knorr, Comptroller of the City of Chicago; the Policemen's Annuity and Benefit Fund of Chicago; the Firemen's Annuity and Benefit Fund of Chicago; the Municipal Employees' Annuity and Benefit Fund of Chicago; and the Laborers' and Retirement Board Employees' Annuity and Benefit Fund of Chicago, Defendants–Appellees.

No. 92–2314.

United States Court of Appeals, Seventh Circuit.

Argued April 6, 1993.

Decided Oct. 12, 1993.

John J. Lowrey, Clinton A. Krislov (argued), Jonathan Nachsin, Lisa E. Waisbren, Krislov & Associates, Chicago, IL, for plaintiffs-appellants.

Stuart D. Fullerton (argued), Office of Corp. Counsel, Lawrence Rosenthal, Deputy Corp. Counsel, Jean Dobrer, Kelly R. Welsh, Asst. Corp. Counsels, Benna R. Solomon, Office of Corp. Counsel, Appeals Div., Kevin M. Forde, Mary Anne Mason, Janice R. Forde, Katrina Veerhusen, Martin J. Burns, Jacobs, Burns, Sugarman & Orlove, Chicago, IL, for defendants-appellees.

Before RIPPLE and MANION, Circuit Judges, and ENGEL, Senior Circuit Judge.*

RIPPLE, Circuit Judge.

This case arises from the dissatisfaction of some City of Chicago employees with a settlement agreement reached in state court regarding a dispute over the terms of a health care plan offered by the City. Because the *Retired Chicago Police Association v. City of Chicago* action and the *Ryan v. City of Chicago* action are substantially similar, they were consolidated by the district court. The district court granted summary judgment against the *Ryan* plaintiffs on the basis of res judicata. It then denied the Retired Chicago Police Association's (RCPA) motions for preliminary injunction and for class certification, and subsequently dismissed RCPA's complaint for lack of associational standing.[1] The RCPA and its proposed class, the *Ryan* plaintiffs, and the potential intervenors all appeal the judgment of the district court. For the reasons that follow, we affirm in part and reverse and remand in part.

## I

## BACKGROUND

### A. *Early History of the City's Health Care Plan*

This case has a lengthy and complex procedural history, both in the Illinois state courts and in the federal district court. We shall set forth only those facts necessary for resolution of this appeal. The four pension funds here at issue, the Policemen's Annuity and Benefit Fund, the Firemen's Annuity and Benefit Fund, the Municipal Employees' Annuity and Benefit Fund, and the Laborers' and Retirement Board Employees' Annuity and Benefit Fund (the Funds) were organized under the authority of the state pension code to provide for and administer pension benefits for certain retired city employees. Since the early part of the last decade, the Funds' annuitants participated in the City's health care plan. This plan made health care coverage available for retired employees. In 1982, the City, as it had been doing periodically, increased the premium rates charged to annuitants and set a fixed premium for coverage. The state of Illinois then enacted legislation to address specifically annuitants' health benefits coverage. The legislation required the Police and Firemen's Funds to purchase group health insurance for their beneficiaries and required the City to subsidize partially the costs of annuitant health care coverage. According to the City, any premium not covered by the City's subsi-

---

* The Honorable Albert J. Engel, of the Sixth Circuit Court of Appeals, is sitting by designation.

1. Motions to intervene submitted by a group of individuals and a political action committee were also denied.

dy had to be paid by the individual annuitants.[2] The legislation further required the City to levy a special tax to raise sufficient revenue to cover the Funds' new mandatory monthly contributions. At the time of the enactment of the legislation, the subsidies from the City to the Funds covered the entire monthly premium charged under the City's plan. However, during the ensuing years, the costs of health care spiraled upward. The Funds did not make contributions out of the annuitants' benefits. Consequently, as the 1982 premiums began to cover decreasing percentages of the total cost of annuitant coverage, the City has shouldered an ever-increasing share of total annuitant health care costs with additional subsidies.

B. *The State Litigation*

In 1987, the City brought suit against the Funds in state court. It sought a judgment permitting it to terminate annuitant health care coverage under its plan and declaring that it had no obligation to subsidize coverage. It also sought to recover the money it had already expended on health care benefits. *See City of Chicago v. Korshak*, Circuit Court of Cook County, Chancery Div. No. 87 CH 10134. The Trustees of the Funds counterclaimed and filed a motion for an injunction to bar the City's threatened termination of health care coverage.

A group of annuitants then moved to intervene in the litigation. They sought to protect the interests of the individual annuitants who participated in the City's plan by requiring that the plan be maintained as previously set by the City. On May 5, 1988, the state court granted their motion to intervene and designated these intervenors as representatives for a certified class of annuitants who had retired on or before December 31, 1987 (the 1987 or *Korshak* class). The RCPA also moved for intervention and class certification, but both of those motions were denied.

On May 16, 1988, the court dismissed the City's complaint, but proceeded to conduct a bench trial on the Funds' counterclaims. Before the court issued its ruling, however, the City and the Funds reached a settlement agreement in which they agreed to co-sponsor legislation that would change the Illinois Pension Code. The resulting legislation increased the amount that the Funds would contribute to the health care premium of each annuitant. It also required the City to continue to provide health care coverage through 1997 by paying at least fifty percent of the cost, an obligation that would continue to be funded by a special tax. Annuitants would be responsible for paying any costs remaining after all contributions and subsidies had been paid. If no new agreement was reached by the expiration of this legislation, the plan would return to its pre-settlement terms.

After the legislation allowing the pension changes was enacted, the state court conducted a fairness hearing in regard to the terms of the settlement agreement. At the hearing, several class members testified against the settlement and none spoke in favor of it. The annuitant-intervenors were not pleased with the terms of the settlement; their goal had been to prohibit the City from changing the terms of the health care plan for existing participants and from thereby raising the costs to each annuitant. Over these objections, the court approved the settlement agreement. The 1987 class then filed an appeal.

C. *The Present Action*

While the appeal was pending in the Illinois courts, the RCPA filed a class action (the *RCPA* claim) against the City, several city officials, and the Funds in federal district court. The proposed class comprised: "all annuitants of the City of Chicago Police, Fire, Municipal and Laborers' Pension Funds and their spouses, survivors and dependents who are current participants in the City's Annuitant Healthcare Plan" and whose participation began after December 31, 1987 (the end date of the *Korshak* class) and prior to August 23, 1989 (the date on which the *Korshak* legislation, described above, was enacted). R. 1 at 3–4. The proposed RCPA

---

2. In 1985, similar legislation was enacted with respect to the Municipal Employees' Fund and the Laborers' Fund.

class, therefore, had not been included in the class certified for the *Korshak* settlement.

In its complaint, the RCPA alleged that the City and the Funds had violated 42 U.S.C. § 1983 (1988) by abrogating annuitants' rights secured under the Contract Clause and the Fourteenth Amendment of the United States Constitution. In essence, the plaintiffs alleged that the settlement agreement stemming from the state litigation altered the terms of the City's health plan and the related obligations of the City and the Funds in violation of the Contract Clause, as well as the Due Process and Equal Protection Clauses of the Fourteenth Amendment. The RCPA also asserted state breach of contract and estoppel claims, as well as violations of the Illinois Constitution. The RCPA contended that the City had promised the annuitants they would have lifetime health care coverage at unchanged rates. It further asserted that the Funds had advised annuitants that premium subsidies would be paid throughout an annuitant's retirement by his respective Fund, thus providing essentially free health care coverage for life. The annuitants would pay only for additional coverage for spouses and dependents. The RCPA alleged that these promises had been made to the annuitants in a variety of ways, through oral representations at retirement seminars, in a booklet prepared by the City to explain the benefits of its health care plan, and by word of mouth and general understanding. The RCPA sought declaratory and injunctive relief to bar the *Korshak* settlement from taking effect, to prohibit the City from changing the terms of annuitant health care costs under the plan, and to determine that the annuitants' premiums would be paid by the appropriate Fund. The district court stayed all proceedings until the state appeals in *Korshak* were resolved.[3]

In addition to the RCPA's request for class certification, ten individual retired city employees participating as annuitants in the Police Fund (the Ahlfeld group), filed a motion for intervention and class certification, adopted the allegations of the RCPA's complaint, and averred that their claims involved and relied upon the same facts and law. R. 49 at 1–2. The court also received a separate motion for intervention and class certification by the Coalition of Active and Retired Employees Political Action Committee (C.A.R.E.P.A.C.). R. 127.

The City and the Funds claimed that the *Korshak* proceedings barred the RCPA's claim on the ground of res judicata. The district court disagreed and on September 10, 1991, held that the 1988 proposed class was not barred by res judicata from continuing to pursue their claims.

On September 30, 1991, the *Ryan* class (or 1987 class) filed a separate complaint nearly identical to that which the RCPA had filed. R. 1, *Ryan v. City of Chicago*, No. 91 C 6200 (N.D.Ill.). This was the identical class that had intervened in *Korshak* and had participated in the settlement hearing. Due to the similarities of the complaints in *Ryan* and *RCPA* and the fact that the same attorney represented both proposed classes, the two cases were consolidated by the district court. *Ryan* R. 10.

In February 1990, the RCPA brought its first motion for a preliminary injunction to keep the City from changing the terms of the health care plan during the litigation. This motion was held in abeyance on assurances by the City that it would treat the post–1987 annuitants (the *RCPA* claimants) the same as the pre–1987 annuitants. Despite these assurances, in October 1991, the City decided to change the terms of the plan. The RCPA brought another motion for preliminary injunction. The district court denied the motion without explanation and the RCPA requested reconsideration. On November 12, the City reiterated its plans to change the terms of coverage. Again the RCPA filed a motion for preliminary injunction. The court

---

**3.** The fairness of the settlement agreement was upheld in *City of Chicago v. Korshak*, 206 Ill. App.3d 968, 151 Ill.Dec. 797, 565 N.E.2d 68 (1990). The Illinois Supreme Court subsequently denied leave to appeal, *City of Chicago v. Korshak*, 139 Ill.2d 594, 159 Ill.Dec. 105, 575 N.E.2d 912 (1991), and the Supreme Court of the United States denied a petition for a writ of certiorari in *Ryan v. City of Chicago*, —— U.S. ——, 112 S.Ct. 1291, 117 L.Ed.2d 515 (1992).

apparently did not address this motion.[4] The City's new plan went into effect on January 1, 1992.

On January 6, 1992, the district court granted the City's motion for summary judgment with respect to the *Ryan* claims. The court found that the *Ryan* plaintiffs' claims were barred by res judicata due to the binding effect of the *Korshak* settlement. The district court then denied the RCPA's motion for class certification. The court held that the typicality and adequacy of representation requirements for class certification were lacking. The district court also denied the motions for intervention by the Ahlfeld group and C.A.R.E.P.A.C. This denial was based on procedural grounds: (1) the motions were not accompanied by a pleading setting forth the claims on which intervention was sought and (2) the motions improperly attempted to expand the scope of the class defined in the RCPA's complaint. The RCPA moved for reconsideration and stated that it would amend its complaint to comport with the expanded class definition. The court granted the motion to reconsider, but again denied the motions to intervene and to certify the classes. The district court held that the denial to intervene mooted the potential intervenors' motions for class certification, but, in the alternative, analyzed the merits of these claims for certification while addressing the RCPA's own certification motion, which the court also denied.

The district court then questioned the RCPA's standing to maintain the action in a representational capacity for its members rather than as a class representative. The district court concluded that the organization had no standing to pursue the claim and dismissed the RCPA's complaint. In the court's view, the action required individual member participation and therefore found that associational standing was inappropriate.

Final judgment was entered for defendants on April 30, 1992. The RCPA, the putative intervenors, and the *Ryan* plaintiffs all appeal from that judgment.

## II

## ANALYSIS

A. *Summary Judgment Based on Res Judicata and the* Korshak *Settlement*

1. The *Ryan* class

To determine whether the *Korshak* settlement bars the *Ryan* claims, we must give a state court judgment the same effect that it would be given by that state. 28 U.S.C. § 1738 (1988).[5] "Congress has specifically required all federal courts to give preclusive effect to state-court judgments whenever the courts of the State from which the judgments emerged would do so...." *Allen v. McCurry*, 449 U.S. 90, 96, 101 S.Ct. 411, 415, 66 L.Ed.2d 308 (1980); *see also Diginet, Inc. v. Western Union ATS, Inc.,* 958 F.2d 1388, 1396 (7th Cir.1992) (stating that federal courts must apply the preclusion rules of the state from which the judgment arose); *Greening v. Moran,* 953 F.2d 301, 305 (7th Cir.) (stating same), *cert. denied,* —— U.S. ——, 113 S.Ct. 77, 121 L.Ed.2d 42 (1992). To assess the preclusive effect of an Illinois state court judgment, therefore, we must apply that state's res judicata requirements. Under Illinois law, an action is barred by res judicata when there exists: "(1) a final judgment on the merits rendered by a court of competent jurisdiction; (2) an identity of cause of action; and (3) an identity of parties or their privies." *People ex rel. Burris v. Progressive Land Developers, Inc.,* 151 Ill.2d

4. RCPA states that this motion was effectively denied on March 25, 1992, when the district court denied all pending motions by RCPA.

5. 28 U.S.C. § 1738 states in pertinent part:

The records and judicial proceedings of any court of any such State, Territory or Possession, or copies thereof, shall be proved or admitted in other courts within the United States and its Territories and Possessions by the attestation of the clerk and seal of the court annexed, if a seal exists, together with a certificate of a judge of the court that the said attestation is in proper form.

Such Acts, records and judicial proceedings or copies thereof, so authenticated, shall have the same full faith and credit in every court within the United States and its Territories and Possessions as they have by law or usage in the courts of such State, Territory or Possession from which they are taken.

285, 176 Ill.Dec. 874, 879, 602 N.E.2d 820, 825 (1992); *see also Welch v. Johnson,* 907 F.2d 714, 720 (7th Cir.1990) (stating same). The district court determined that all three of these elements were satisfied in regard to the proposed *Ryan* class. Thus, it held that, with respect to the *Ryan* claims, the class action was barred by the settlement in *Korshak,* and entered judgment for the City and the Funds.

The *Ryan* annuitants contend that the district court improperly granted summary judgment against them on the basis of res judicata. While they concede that the proposed class was a party to *Korshak* because the state court granted them intervention in the action, they submit that the other two required elements of res judicata are not fulfilled. First, the *Ryan* plaintiffs contend that no identity of cause of action exists between *Korshak* and the present litigation because the proposed class alleges constitutional violations which it did not allege in the previous action. The *Ryan* claimants also note that they now allege a breach of fiduciary duty by the Fund Trustees when they agreed to the *Korshak* settlement. They contend that these claims could not have been asserted in that litigation. The *Ryan* plaintiffs also contend that *Korshak* was a suit over promises that the City made to the Funds regarding payment of subsidies; here, on the other hand, they state that they are basing their claims on promises that the City made directly to the annuitants. This variance, they submit, gives rise to a different cause of action. Second, the *Ryan* plaintiffs assert that no final judgment on the merits of the 1987 class' claims was ever rendered in *Korshak.* They contend that no decision on the merits was entered by the state court because the court merely approved a settlement between the City and the Funds.

### a. identity of cause of action

The Illinois Supreme Court has stated that, " '[i]f the same facts are essential to the maintenance of both proceedings or the same evidence is needed to sustain both, then there is identity between the allegedly different causes of action asserted and res judicata bars the latter action.' " *Progressive Land Developers,* 176 Ill.Dec. at 879, 602 N.E.2d at 825 (quoting *Morris v. Union Oil Co.,* 96 Ill.App.3d 148, 51 Ill.Dec. 770, 421 N.E.2d 278 (1981)); *see also People ex rel. Hartigan v. Illinois Commerce Comm'n,* 243 Ill.App.3d 544, 183 Ill.Dec. 673, 678, 611 N.E.2d 1321, 1326 (1993) (stating that if same facts or evidence are essential to both proceedings, then identity of causes of action exists between them). The court also noted that, while one group of facts can be the basis for numerous theories of recovery, there remains only a single cause of action. *Progressive Land Developers,* 176 Ill.Dec. at 879, 602 N.E.2d at 825.

We agree with the district court that the *Ryan* cause of action arises from the same factual basis as *Korshak.* The same facts form the foundation of both claims, and the same evidence is essential to the resolution of both. Variance in the theory of recovery cannot turn the claim into a different cause of action. Both *Korshak* and *Ryan* involve the City's alleged obligation to pay for health care and both claims sought to maintain the 1982 level of payments and subsidies. Moreover, we also note that Illinois res judicata law bars not only those issues actually raised in the first action, but also those that could have been raised in the proceeding. *Greening,* 953 F.2d at 305 (setting forth Illinois law); *Redfern v. Sullivan,* 111 Ill.App.3d 372, 67 Ill.Dec. 166, 169, 444 N.E.2d 205, 208 (1983). All of the issues that the *Ryan* plaintiffs attempt to raise in this litigation could have been raised in the earlier litigation. *See Welch,* 907 F.2d at 720; *LaSalle Nat'l Bank of Chicago v. County of DuPage,* 856 F.2d 925, 930–31 (7th Cir.1988), *cert. denied,* 489 U.S. 1081, 109 S.Ct. 1536, 103 L.Ed.2d 840 (1989).[6] Accordingly, the

---

**6.** The *Ryan* plaintiffs also argue that, because they objected to the *Korshak* settlement, they should not be bound by it. Our review is limited to determining whether the elements of Illinois res judicata law have been satisfied. The 1987 class exhausted its direct appeals from the settle- ment order and the binding effect of that action would have been better addressed in those appeals. To the extent plaintiffs are questioning whether the prior state court proceeding met minimum due process requirements, we note that the state trial court allowed them to present

district court correctly held that, under Illinois law, an identity of causes of action exists between *Korshak* and *Ryan.*

### b. final judgment on the merits

We also agree with the district court that a final judgment on the merits was reached in *Korshak.* Despite the intervenors' objections in *Korshak*, the state court found the settlement agreement fair and entered an order approving the settlement and dismissing all claims with prejudice. R. 32 at Appendix C. "Dismissal with prejudice is deemed to be as conclusive of the rights of the parties as if the matter had proceeded to trial and had been resolved by final judgment adverse to the plaintiff." *Morris v. Union Oil Co.,* 96 Ill.App.3d 148, 51 Ill.Dec. 770, 776, 421 N.E.2d 278, 284 (1981); *see also McLain v. West Suburban Hosp. Medical Ctr.,* 208 Ill.App.3d 613, 153 Ill.Dec. 574, 576, 567 N.E.2d 532, 534 (1990) (stating that settlement and dismissal of claim with prejudice was an adjudication on the merits); *Gillilan v. Trustees for Cent. States, Southeast and Southwest Areas Pension Fund,* 183 Ill. App.3d 306, 131 Ill.Dec. 950, 957, 539 N.E.2d 303, 310 (1989) (stating that "dismissal with prejudice entered pursuant to a settlement agreement constitutes a final judgment on the merits sufficient for application of *res judicata* "). Because all three elements required for preclusion under Illinois law have been satisfied, summary judgment was properly entered for the City and the Funds on the *Ryan* claims.

### 2. The *RCPA* claims

■ The City and the Funds also moved for summary judgment against the RCPA

based on the contention that the RCPA's claims should be barred by the res judicata effect of the *Korshak* agreement. The district court denied the motion. It held that an identity of parties or their privies had not been shown to exist between the *Korshak* proceedings and the *RCPA* claims. The RCPA had been denied intervention in the *Korshak* litigation. Moreover, the class it proposed to the district court here consisted only of annuitants who retired after December 31, 1987, the end date of the *Korshak* class. Thus, these annuitants had not been included as part of the intervening class in *Korshak.* After concluding that the RCPA had not been a party in *Korshak*, the district court then held that these plaintiffs had also not been in privity with a party to those proceedings; therefore, res judicata could not preclude the federal claims.[7]

■ The City and the Funds now advance the argument that the RCPA is in privity with the Funds which were parties to the *Korshak* agreement.[8] In short, the City acknowledges that the proposed RCPA class was not a party to *Korshak*, but contends that the RCPA and its members, as beneficiaries of the Funds, were in privity with the Funds and their Trustees who were indeed parties to the state court proceedings. Additionally, the Funds assert that the involvement of the 1987 class (also members of the RCPA) as intervenors in *Korshak*, the involvement of the president of the RCPA who was allowed to testify at the fairness hearing in his individual capacity, and the fact that counsel in both *Korshak* and *RCPA* was the same person demonstrate that the interests of the proposed RCPA class were represented adequately in *Korshak*, thus creating an identity of parties.

their views at the settlement hearing, and the fairness of the settlement was upheld on the plaintiffs' state court appeal.

7. Because the other two elements of res judicata under Illinois law—finality of judgment and identity of cause of action—are satisfied, RCPA's federal action is precluded if privity does exist.

8. Although the district court rejected this argument, the City and the Funds need not file a cross-appeal to raise it again in this court. As the prevailing parties in the district court, the City and the Funds may advance, in support of the judgment, all arguments they presented to

that court. They need not "file a cross-appeal just because the district judge rejected one of [their] arguments on the way to deciding in [their] favor." *Rose Acre Farms, Inc. v. Madigan,* 956 F.2d 670, 672 (7th Cir.) (citing *Massachusetts Mut. Life Ins. Co. v. Ludwig,* 426 U.S. 479, 96 S.Ct. 2158, 48 L.Ed.2d 784 (1976)), *cert. denied,* —— U.S. ——, 113 S.Ct. 68, 121 L.Ed.2d 34 (1992). The City and the Funds are, therefore, allowed to propound an alternative ground for affirmance that the district court ignored or rejected. *See Abbs v. Sullivan,* 963 F.2d 918, 925 (7th Cir.1992).

■■ For purposes of res judicata, the Illinois Supreme Court has stated that privity exists "between parties who adequately represent the same legal interests ... [and it] is the identity of interest that controls in determining privity, not the nominal identity of the parties." *Progressive Land Developers*, 176 Ill.Dec. at 879–80, 602 N.E.2d at 825–26 (citations omitted); *see also Singer v. Brookman*, 217 Ill.App.3d 870, 160 Ill.Dec. 822, 824–25, 578 N.E.2d 1, 3–4 (1991) (stating that for parties to be in privity with one another for purposes of res judicata, they must have "the same legal rights or interests"). Adequate representation of the same legal interests necessarily entails the absence of conflicts of interest between the party in the prior action and that in the subsequent action. *See Hartigan*, 183 Ill.Dec. at 678, 611 N.E.2d at 1326. As the City contends, trustees and their beneficiaries may often be in privity with each other. Nevertheless, such a relationship should not be assumed. Beneficiaries not made a party to a legal action may be bound by their trustees' participation only when the beneficiaries' interests are properly represented. Those interests must receive actual and efficient protection by the trustees' participation.[9] These principles are merely corollaries of the general proposition that privity exists only when the parties' legal interests are the same.

We agree with our colleague in the district court that the City and the Funds have not sufficiently demonstrated that the legal interests of the *Korshak* parties and the putative RCPA class were sufficiently similar to constitute adequate representation by the Funds' participation. As the district court noted, the pension funds were negotiating with the City for the continuation of a health care plan. However, the Funds also had an incentive to limit the extent of their own subsidies to the City's plan. R. 89, *RCPA Mem.Op.* at 12. This incentive created a potential conflict of interest with the annuitants.[10] Thus, because the *RCPA* plaintiffs were not in privity with the litigants in the prior *Korshak* action, we agree with the district court that the *Korshak* settlement has no res judicata effect against the RCPA's subsequent claims.

### B. Denial of Motions to Intervene [11]

The district court refused to grant either the motion to intervene submitted by

---

**9.** *See, e.g., In the Matter of Estate of Breault v. Breault*, 63 Ill.App.2d 246, 211 N.E.2d 424, 437–38 (1965) (stating that beneficiary is bound by suit in which trustee was a party and rendered actual and efficient protection of beneficiary's interests); *Anderson v. Elliott*, 1 Ill.App.2d 448, 117 N.E.2d 876, 879 (1954) (holding that where trustee provides actual and efficient protection of beneficiary's interests, beneficiary is not a necessary party to the suit).

**10.** Certainly the state court must have entertained some concern with the Funds' ability to represent annuitants in the *Korshak* settlement proceedings because it allowed the pre–1988 annuitants to intervene as a class and thus to take part in the fairness hearing.

**11.** Although no party raises the issue, we have examined whether this court has jurisdiction to review the decision of the district court not to entertain the defective motions to intervene. We note that the district court denied both the C.A.R.E.P.A.C. and Ahlfeld group's motions to intervene in an order dated March 23, 1992. Nevertheless, the putative intervenors did not file a notice of appeal until May 29, 1992, over two months later. "An order denying intervention is final and appealable.... By necessity such an order is subject to immediate review, because denial of intervention precludes the proposed intervenor's ability to appeal the later judgment (and at that time to challenge the earlier denial of intervention)." *B.H. v. Murphy*, 984 F.2d 196, 199 (7th Cir.), *cert. denied*, — U.S. ——, 113 S.Ct. 2930, 124 L.Ed.2d 680 (1993). Movants denied intervention do not become parties. Thus, an appeal of a denial of a motion to intervene "must be filed within thirty days after the date of entry of the judgment or order appealed from." *Id.* (quoting Fed.R.App.P. 4(a)(1)). *See Brotherhood of R.R. Trainmen v. Baltimore & Ohio R.R.*, 331 U.S. 519, 67 S.Ct. 1387, 91 L.Ed. 1646 (1947); *cf. Stringfellow v. Concerned Neighbors in Action*, 480 U.S. 370, 107 S.Ct. 1177, 94 L.Ed.2d 389 (1987) (a party denied intervention as a matter of right but allowed permissive intervention may not appeal denial of intervention as of right because, as a party, he may appeal upon the rendition of a final judgment). In *Shores v. Sklar*, 844 F.2d 1485, 1491 (11th Cir.1988), *reinstated in part*, 885 F.2d 760, 761 (11th Cir.1989), *cert. denied*, 493 U.S. 1045, 110 S.Ct. 843, 107 L.Ed.2d 838 (1990), the Eleventh Circuit held that an unnamed member of a putative class who moved to intervene as a named plaintiff could not wait until final judgment to appeal the denial of his motion; he was required to appeal the denial within thirty days of the entry of the order.

Nevertheless, the particular circumstances of this case make it difficult to conclude that we are

C.A.R.E.P.A.C. or that of the Ahlfeld group because it determined that neither submission satisfied the procedural requirements for intervention set forth in Rule 24 of the Federal Rules of Civil Procedure. Rule 24(c) requires that "[t]he motion [to intervene] shall state the grounds therefor and shall be accompanied by a pleading setting forth the claim or defense for which intervention is sought." Neither of the motions to intervene was accompanied by such a pleading.

█ █ The putative intervenors assert that they did indeed meet Rule 24(c)'s pleading requirement because each of their motions specifically adopted the allegations of the RCPA's complaint. They claim that adoption by incorporation is a valid method by which to meet the pleading requirement because, under Federal Rule of Civil Procedure 10(c), pleadings may be adopted by reference in other motions.[12] As we have held previously, however, the requirement of Rule 24(c) is unambiguous and, as a general rule, compliance may not be achieved simply by adopting the prior pleadings of a party. *Shevlin v. Schewe*, 809 F.2d 447, 450 (7th Cir.1987). "The motion to intervene technically may not just 'adopt' the pleadings of an original party, nor may it merely describe a future pleading...." *Id.* As the district court recognized, however, we do not take an inflexible view of this rule; if no prejudice would result, a district court has the discretion to accept a procedurally defective motion. *Id.*

█ Whether to permit a procedurally defective motion to intervene is within the sound discretion of the district court. In this instance, the district court refused to permit such a deviation from the requirement of the Rule. It noted that not only were the motions procedurally defective, but both motions to intervene attempted to redefine and significantly expand the scope of the class defined in the RCPA's complaint. The Ahlfeld group's motion sought intervention for plaintiffs whose benefits had vested prior to August 23, 1989. This clearly would have expanded the RCPA's proposed class which contained only those individuals who had retired and become participants prior to that date. The C.A.R.E.P.A.C. motion to intervene also sought to include all individuals who were either participating or whose benefits had vested prior to August 23, 1989. Again, the motion was an obvious expansion of the class sought by the RCPA in its complaint. These differences between the motions to intervene and the RCPA's complaint, were, in the view of the district court, too significant to allow waiver of Rule 24(c). Moreover, the district court noted that the City and the Funds had pointed out the procedural defects in the motions earlier in the litigation, but the putative intervenors had made no effort to rectify the deficiencies until their motions had been denied.[13] R. 271, Mem.Op. at 12. We cannot say that the district court abused its discretion when it

---

without jurisdiction to review this matter on appeal. After holding the motions to intervene inadequate, the district court immediately proceeded to discuss the merits of the motions for class certification filed by the putative intervenors. The district court took this step, "in anticipation of a belated motion by the intervenors to file procedurally correct motions." R. 271, Mem.Op. at 13. By choosing this course of proceeding, the district court appears to have expected that the putative intervenors would conform their motions to the court's ruling and therefore deserve a decision on the merits of their class certification request. Under these circumstances, we do not believe that it is compatible with the policy of finality that animates 28 U.S.C. § 1291 to hold that the ruling of the district court on the matter of intervention was a final judgment and that the putative intervenors were required to take an immediate appeal. *Cf. J.I. Case Credit Corp. v. First Nat'l Bank*, 991 F.2d 1272, 1275 (7th Cir.1993) (stating that dismissal

without prejudice is generally not final and appealable); *Production and Maintenance Employees' Local 504*, 954 F.2d 1397, 1402 (7th Cir. 1992) (stating same); *Ordower v. Feldman*, 826 F.2d 1569, 1572 (7th Cir.1987) (noting that "[i]f a district court's dismissal leaves a plaintiff free to file an amended complaint, the dismissal is not considered a final appealable order").

12. The rule states in pertinent part: "Statements in a pleading may be adopted by reference in a different part of the same pleading or in another pleading or in any motion." Fed.R.Civ.P. 10(c).

13. Both C.A.R.E.P.A.C. and the Ahlfeld group contend that, after the court initially denied their motions to intervene, they stated that the RCPA would amend the complaint to conform to the district court's concerns. However, the court dismissed the motion to amend as moot after it dismissed the RCPA's complaint for lack of standing. Although the argument is somewhat

refused to entertain both C.A.R.E.P.A.C.'s and the Ahlfeld group's procedurally deficient motions for intervention.

## C. Denial of Class Certification

The district court denied the motions of all three groups—the RCPA, C.A.R.E.P.A.C., and the Ahlfeld group—for class certification.[14] Under Federal Rule of Civil Procedure 23,[15] a district court has broad discretion to determine whether certification of a class is appropriate. *United Indep. Flight Officers, Inc. v. United Air Lines, Inc.*, 756 F.2d 1274, 1283 (7th Cir. 1985). Our review of a district court's denial of class certification is therefore circumscribed. "We reverse a district court's ruling regarding class certification only when we conclude that the district court abused its discretion in reaching its decision." *Harriston v. Chicago Tribune Co.*, 992 F.2d 697, 703 (7th Cir.1993).[16] Furthermore, the party seeking class certification assumes the burden of demonstrating that certification is appropriate. *Trotter v. Klincar*, 748 F.2d 1177, 1184 (7th Cir.1984).

The plaintiffs sought class certification under Federal Rule of Civil Procedure 23(b)(2).

This subsection requires that the court find that the opposing parties' conduct or refusal to act must be generally applicable to the class and that final injunctive or declaratory relief with respect to the entire class would be the appropriate remedy. Moreover, as a preliminary requirement for any class certification, a named plaintiff must demonstrate that his motion satisfies the mandate set forth in Federal Rule of Civil Procedure 23(a): he "must meet the prerequisites of numerosity, commonality, typicality, and adequacy of representation." *Harriston*, 992 F.2d at 703 (citations omitted). All of these elements are prerequisites to certification; failure to meet any one of them precludes certification as a class. *Id.* The district court determined that the proposed RCPA class satisfied both the numerosity and commonality elements of Rule 23(a); however, it held that typicality and adequacy of representation had not been demonstrated sufficiently to allow certification.

### 1. Typicality

As this court stated in *De La Fuente v. Stokely-Van Camp, Inc.*, 713 F.2d 225, 232 (7th Cir.1983), the typicality requirement

unclear, the putative intervenors seem to assert that, because the RCPA was willing to amend its complaint, the district court should have permitted it to do so, and thus the court improperly denied their requests for intervention. Additionally, in their notice of appeal, appellants state that they appeal the denial of the motion to amend the RCPA's complaint. In their brief on appeal, however, they set forth neither arguments regarding why the denial was inappropriate nor why this court should reverse the district court's order. Thus, we shall not examine this issue.

**14.** As unsuccessful movants for intervention, C.A.R.E.P.A.C. and the Ahlfeld group may appeal only the order denying them intervention. Because their motions to intervene were denied, the potential intervenors never became named parties to the case; therefore, they have standing only to appeal the order regarding intervention. *See United States v. City of Chicago*, 870 F.2d 1256, 1258 (7th Cir.1989) (stating that until putative intervenors become parties "they cannot appeal from any order in the proceeding other than the denial of that motion"); *Hunter v. Department of the Air Force Agency*, 846 F.2d 1314, 1317 (11th Cir.1988) (noting that "one who is denied permission to intervene in an action will not be in a position to take an appeal from the final judgment"). The district court recognized

that its denial of intervention mooted the putative intervenors' other motions; however, it addressed the merits of the putative intervenors' motions for class certification in the context of RCPA's motion. R. 271, Mem.Op. at 13. Because we have affirmed the district court's decision not to accept the motions to intervene, we shall not address the putative intervenors' motions for class certification.

**15.** Rule 23(a) states:

One or more members of a class may sue or be sued as representative parties on behalf of all only if (1) the class is so numerous that joinder of all members is impracticable, (2) there are questions of law or fact common to the class, (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class, and (4) the representative parties will fairly and adequately protect the interests of the class.

**16.** *See also Rosario v. Livaditis*, 963 F.2d 1013, 1017 (7th Cir.1992) (stating same), *cert. denied*, — U.S. —, 113 S.Ct. 972, 122 L.Ed.2d 127 (1993); *Simer v. Rios*, 661 F.2d 655, 668 (7th Cir.1981) (stating that denial of class certification reviewed only for abuse of discretion), *cert. denied*, 456 U.S. 917, 102 S.Ct. 1773, 72 L.Ed.2d 177 (1982).

primarily directs the district court to focus on whether the named representatives' claims have the same essential characteristics as the claims of the class at large. "A plaintiff's claim is typical if it arises from the same event or practice or course of conduct that gives rise to the claims of other class members and his or her claims are based on the same legal theory."

(quoting H. NEWBERG, CLASS ACTIONS § 1115(b) at 185 (1977)). "The typicality requirement may be satisfied even if there are factual distinctions between the claims of the named plaintiffs and those of other class members." *De La Fuente*, 713 F.2d at 232. Nevertheless, for effective representation of a class, the named representatives' claims must "have the same essential characteristics as the claims of the class at large." *Id.*

■ The district court noted that the RCPA's primary assertion is that the City and the various Funds communicated to pension annuitants the availability of effectively free lifetime health care and that the annuitants relied upon those communications. These claims turn on representations allegedly made ·by the City and the Funds to various groups of city workers. The RCPA, however, is comprised entirely of police retirees. It is not known whether the communications allegedly made by the City and the Funds to *each group of city employees* regarding the health care plan were identical. The only evidence in the record pertains to police pre-retirement seminars and, even in that circumstance, it is not known whether the communications were uniformly made at every seminar. Presumably each of the other three groups of city employees had its own pre-retirement seminars and pamphlets. Appellants have not provided any evidence other than speculation that any alleged communications by the City or the Funds to the fire, laborer, or municipal annuitants were the same as those made to the police. Even among the police, the record indicates that some annuitants heard these communications at retirement seminars, some read a booklet, some heard through word of mouth, and many simply had a general impression of the benefits to which they were allegedly entitled. Some were ignorant of any alleged promises.

Because the RCPA does not include individuals from all of the fund groups and there is no indication that each of these groups was treated identically by the City or by its respective fund, its claims cannot be deemed typical of the entire proposed class. The RCPA is composed only of retired police officers, and it simply cannot be assumed, especially because these communications were for the most part verbal,[17] that the claims of these police officers "have the same essential characteristics as the claims of the class at large." *De La Fuente*, 713 F.2d at 232. Unlike the situation in *De La Fuente* where "[a]ll members of the class were subject to the same allegedly unlawful practices," *id.*, the putative class has not demonstrated that the police annuitants' claims have the same essential characteristics as the claims of the class at large. Nor have they demonstrated that the same alleged course of conduct occurred with respect to the other types of annuitants. Moreover, the asserted estoppel claims depend on the particular nature of the communications allegedly made in a particular instance and on each annuitant's reliance on that particular communication.[18]

17. We note that there is some authority that claims based substantially on oral rather than written communications are inappropriate for treatment as class actions unless the communications are shown to be standardized. *Graham v. Security Sav. and Loan*, 125 F.R.D. 687, 690 (N.D.Ill.1989), *aff'd on other grounds, Veal v. First American Sav. Bank*, 914 F.2d 909 (7th Cir.1990); *Glick v. E.F. Hutton & Co.*, 106 F.R.D. 446, 450 (E.D.Pa.1985); *Seiler v. E.F. Hutton & Co.*, 102 F.R.D. 880, 888 (D.N.J.1984); *cf. Simon v. Merrill Lynch, Pierce, Fenner and Smith, Inc.*, 482 F.2d 880, 882 (5th Cir.1973). We also note that these cases are mainly fraud and securities cases.

18. In regard to estoppel, the RCPA asserts that as a matter of law, reliance may be imputed by virtue of the fact that all of the RCPA's members or their decedents worked for the City until their retirement. The lone case that the RCPA cites in support of this assertion, *Buddell v. Board of Trustees, State Univ. Retirement Sys.*, 118 Ill.2d 99, 112 Ill.Dec. 718, 514 N.E.2d 184 (1987), does not stand for such a proposition.

Therefore, we are not persuaded that the district court abused its discretion when it determined that the putative class had not satisfied the typicality requirement.

### 2. Adequacy of representation

■ Although failure to fulfill the typicality requirement of Rule 23(a) would, standing alone, invalidate class certification, the district court went on to determine that the proposed RCPA class had not demonstrated adequacy of representation. We have stated that adequacy of representation is composed of two parts: "the adequacy of the named plaintiff's counsel, and the adequacy of representation provided in protecting the different, separate, and distinct interest" of the class members. *Secretary of Labor v. Fitzsimmons,* 805 F.2d 682, 697 (7th Cir.1986) (en banc). Therefore, "[a] class is not fairly and adequately represented if class members have antagonistic or conflicting claims." *Rosario,* 963 F.2d at 1018; *see also Fitzsimmons,* 805 F.2d at 697 (stating same).

■ The district court expressed several reservations about the adequacy of class representation afforded by the RCPA. One of the key infirmities noted by the court was that the scope of the proposed RCPA class was not restricted to those members whose premiums had increased under the City's health care plan. Members who had actually benefitted from the *Korshak* settlement were also included in the putative class. For these members, those benefits would evaporate if the class action succeeded. For example, widows of retirees are paying less in premiums than they were before the *Korshak* settlement because they are now receiving subsidies. The RCPA states that no annuitant has objected to the institution of this class action. This response, however, does not resolve the potential conflicting interests that may exist among the RCPA members. The problem of actual and potential conflicts is a matter of particular concern in a case such as this one because the RCPA's complaint proposed certification under Federal Rule of Civil Procedure 23(b)(2) which does not allow class members to opt out of the class action. *See* R. 271, Mem.Op. at 13 n. 2.

In assessing the adequacy of representation, the district court also noted that, at the time of the *Korshak* settlement, RCPA Executive Secretary Richard Jones was a member of the Board of Trustees of the Police Fund, and he had participated in the Board's action in approving the settlement. In the present action, the RCPA contends that the Fund trustees breached their fiduciary duties to the annuitants by approving the settlement. Thus, noted the district court, there may also be a conflict of interest between the RCPA and one of its officers. While the RCPA stresses that *it* is the proposed class representative and not Jones, thereby eliminating any conflict between Jones and the putative class members, we agree with the district court that this position is troublesome. Jones is the Executive Secretary of the RCPA, the organization instituting this action. As such, a tension surely exists between his previous action and the RCPA's position in this case. For all of these reasons, we do not believe that the RCPA has established that the district court abused its discretion when it determined that the adequacy of representation criterion of the class certification requirements had not been satisfied.

■■ Additionally, contrary to the RCPA's submission, we do not believe the district court engaged in an impermissible examination of the merits of the RCPA's claims in arriving at its denial of class certification. It is true that, as a general principle, a court is not allowed to engage in analysis of the merits in order to determine whether a class action may be maintained. *Eggleston v. Chicago Journeymen Plumbers' Local Union No. 130,* 657 F.2d 890, 895 (7th Cir.1981), *cert. denied,* 455 U.S. 1017, 102 S.Ct. 1710, 72 L.Ed.2d 134 (1982). Nevertheless, some discovery may be necessary to determine whether a class should be certified. *Id.* The Supreme Court has stated:

> As we noted in *Coopers & Lybrand v. Livesay,* 437 U.S. 463 [98 S.Ct. 2454, 57 L.Ed.2d 351], "the class determination generally involves considerations that are 'enmeshed in the factual and legal issues comprising the plaintiff's cause of action.'" *Id.* at 469 [98 S.Ct. at 2458] (quoting *Mer-*

cantile Nat. Bank v. Langdeau, 371 U.S. 555, 558 [83 S.Ct. 520, 522, 9 L.Ed.2d 523] [1963]). Sometimes the issues are plain enough from the pleadings to determine whether the interests of the absent parties are fairly encompassed within the named plaintiff's claim, and sometimes it may be necessary for the court to probe behind the pleadings before coming to rest on the certification question.

General Tel. Co. v. Falcon, 457 U.S. 147, 160, 102 S.Ct. 2364, 2372, 72 L.Ed.2d 740 (1982). We have noted that the "boundary between a class determination and the merits may not always be easily discernible." Eggleston, 657 F.2d at 895. After reviewing the record, we do not believe that the district court transgressed this dividing line. The court correctly analyzed the class certification issue. The appellants have not demonstrated that the district court abused its discretion in refusing to grant the motions for class certification.

### 3. Certification of subclasses

■ The RCPA contends that the district court abused its discretion because it did not certify a subclass composed only of annuitants from the Police Fund.[19] The RCPA believes that such certification would obviate the district court's concerns with typicality and adequacy of representation, the issues that the court found made certification of the RCPA class as a whole inappropriate. The RCPA notes that it requested certification of this subclass in its motion for reconsideration filed in February 1992, after the district court initially denied class certification.[20] Although the court did grant the motion for reconsideration of the district court's initial judgment, to the extent that the RCPA moved for certification of a police subclass, that motion was denied when the court de-

nied all motions pending at the time of summary judgment. See R. 271 and 273. The RCPA claims that the district court abused its discretion by not certifying the requested subclass.

■ Subclasses must satisfy the class action requirements before they may be certified. Fed.R.Civ.P. 23(c)(4). While the district court did not deny explicitly the subclass request, we believe that a fair reading of the record supports the conclusion that the court believed that, even among the retired police officers, uniformity in the alleged promises made by the City and the Funds had not been demonstrated. R. 271, Mem. Op. at 24. The district court found that sufficient evidence of the uniformity of statements formally made by City officials and the Police Fund to the police annuitants in regard to health care benefits during the time period here at issue had not been tendered by the RCPA. Moreover, as noted above, adequacy of representation was not demonstrated by the RCPA. Certification of a subclass consisting only of police annuitants would do nothing to alleviate the conflicts of interest that the district court found existed in that group. Given the limited scope of our review of a district court's denial of class or subclass certification, we do not believe that the RCPA has sufficiently demonstrated an abuse of discretion by the district court.

### D. Associational Standing

■ We now turn to the question of whether the RCPA, although not eligible to act as representative for the putative class, may nevertheless maintain the suit in a representational capacity on behalf of its own members.[21] As the Supreme Court recently

---

**19.** Certification of subclasses is allowed under Federal Rule of Civil Procedure 23(c)(4) which states: "When appropriate (A) an action may be brought or maintained as a class action with respect to particular issues, or (B) a class may be divided into subclasses and each subclass treated as a class, and the provisions of this rule shall then be construed and applied accordingly."

**20.** RCPA's request for certification of a subclass stated: "The Court's conclusion as to the varying extent of reliance among the proposed class does not justify its denial of certification of the entire class. The Court could have certified a smaller

subclass(es).... At the very least, the Court's finding of uniformity in the representations made to Police Fund retirees ... would support its certifying a class comprised of Police Fund retirees." R. 262 at 10.

**21.** We also note that under the associational standing doctrine, an association may represent only its members or the substantial equivalent of members. HOPE, Inc. v. County of DuPage, 738 F.2d 797, 814 (7th Cir.1984) (en banc); cf. American Legal Found. v. FCC, 808 F.2d 84, 91 (D.C.Cir.1987) (quoting HOPE with approval).

emphasized, this inquiry is analytically distinct from the class action issue. In *International Union, United Automobile, Aerospace, and Agricultural Implement Workers of America v. Brock*, 477 U.S. 274, 106 S.Ct. 2523, 91 L.Ed.2d 228 (1986), the Court specifically noted that, while an organization might prove an inadequate representative in some instances to vindicate the rights of its members because of its lack of resources and experience or because it lacks the appropriate authority from its membership, it will more often present a particularly efficient vehicle for litigation from both the viewpoint of the litigants and the perspective of the judicial system. These efficiencies, stated the Court, "distinguish suits by associations on behalf of their members from class actions." 477 U.S. at 289, 106 S.Ct. at 2532. The Court went on to note that, while a class action creates an ad hoc union of injured plaintiffs whose only common link may be their common claims, a preexisting organization can often draw upon a preexisting reservoir of experience, research, and capital. These resources, continued the Court, can often sharpen the presentation of issues appreciably—one of the primary concerns of the doctrine of standing. *Cf. Flast v. Cohen*, 392 U.S. 83, 106, 88 S.Ct. 1942, 1955, 20 L.Ed.2d 947 (1968) ("The 'gist of the question of standing' is whether the party seeking relief has 'alleged such a personal stake in the outcome of the controversy as to assure that concrete adverseness which sharpens the presentation of issues upon which the court so largely depends for illumination of difficult constitutional questions.'" (quoting *Baker v. Carr*, 369 U.S. 186, 204, 82 S.Ct. 691, 703, 7 L.Ed.2d 663 (1962))). The Court stressed that its evaluation was based on the pragmatic view that people join organizations in order to promote interests that they share with the other members. "The very forces that cause individuals to band together in an association will thus provide some guarantee that the association will work to promote

their interests." 477 U.S. at 290, 106 S.Ct. at 2533.

▮ Generally, an injured party "must assert his own legal rights and interests, and cannot rest his claim to relief on the legal rights or interests of third parties." *Warth v. Seldin*, 422 U.S. 490, 499, 95 S.Ct. 2197, 2205, 45 L.Ed.2d 343 (1975). Nevertheless, some exceptions to this rule exist and, in certain cases, "[e]ven in the absence of injury to itself, an association may have standing solely as the representative of its members." *Id.* at 511, 95 S.Ct. at 2211.

> [A]n association has standing to bring suit on behalf of its members when: (a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit.

*Hunt v. Washington Apple Advertising Comm'n*, 432 U.S. 333, 343, 97 S.Ct. 2434, 2441, 53 L.Ed.2d 383 (1977).

While the *Hunt* test is well-established in our jurisprudence and enjoys the specific reaffirmation of the Supreme Court in *Brock*, the application of the various prongs has, to this date, produced a caselaw that does not lend itself to easy distillation.[22] To adjudicate this appeal, we must first address the methodology of the district court. We shall then address an issue that, while not confronted squarely by the district court in this context, is bound to be a concern in subsequent proceedings.

The district court focused on the third element of the *Hunt* test for associational standing, and found that the RCPA had failed to satisfy this element. Therefore, the court did not address the other prongs. The court was of the view that the RCPA did not have representational standing because the claims it alleged would require the participation of individual RCPA members. The

---

RCPA's associational standing should be limited to its own members.

**22.** The Supreme Court has recently discussed what type of injury an association must allege in order to demonstrate standing. *Northeastern*

*Florida Chapter of Associated General Contractors v. City of Jacksonville*, —— U.S. ——, ——————, 113 S.Ct. 2297, 2303–04, 124 L.Ed.2d 586 (1993). That decision does not affect directly our analysis.

court noted that the RCPA's claims were not premised on pure questions of law, but rather involved claims that would require the participation and testimony of individual annuitants. R. 271, Mem.Op. at 33. Specifically, the court stated that the RCPA's claim for lifetime health care coverage at the 1982 rates is "based on a broad array of communications, both written and oral, direct and indirect, emanating from countless sources." *Id.* at 34. Moreover, the estoppel claim mandated individualized inquiry into the RCPA members' reliance on the various alleged communications regarding health care coverage in each member's choice to retire or to participate in the City's plan.

### 1. Participation of individual members

Our colleagues in the Third Circuit recently confronted a case similar in many ways to our own. In *Hospital Council of Western Pennsylvania v. City of Pittsburgh,* 949 F.2d 83 (3d Cir.1991), the Hospital Council [23] had filed a complaint in the district court alleging that the defendant governmental units were attempting to force tax-exempt member hospitals to make payments in lieu of taxes by indicating that, if the hospitals did not make such payments, their tax-exempt status would be challenged or they would likely encounter difficulty with other governmental matters such as zoning approvals. The district court dismissed the complaint. One of the grounds for its ruling was that the Council had not met the third requirement of *Hunt;* it held that the claims asserted and the relief requested would require participation of the individual hospitals in the lawsuit.

In assessing whether participation of individual members was necessary, the Third Circuit noted that, in the third prong of *Hunt,* the Supreme Court stated that associational standing is inappropriate if the claim or request for relief requires "the participation of individual members in the lawsuit."

*Hospital Council,* 949 F.2d at 89 (quoting *Hunt,* 432 U.S. at 343, 97 S.Ct. at 2441). Viewed alone, said Judge Alito, this language could be interpreted to mean that associational standing is not permitted if participation by *any* members of the association would be necessary. However, the court noted that this language in *Hunt* appears to paraphrase a more detailed statement first made by the Supreme Court in *Warth* and repeated in later cases. In *Warth,* 422 U.S. at 511, 95 S.Ct. at 2212, the Supreme Court wrote, "so long as the nature of the claim and the relief sought does not make individual participation of *each* injured party indispensable to proper resolution of the cause, the association may be an appropriate representative of its members, entitled to invoke the court's jurisdiction." (emphasis added). Accordingly, concluded the Third Circuit, it appears that an association may assert a claim that requires participation by *some* members.

Turning to the case before it, the Third Circuit continued that the council's claims would require *some* participation by *some* council members. The court also acknowledged that, unlike many prior associational standing cases, the case was not a challenge to a statute, regulation, or ordinance, but instead involved a challenge to governmental practices. Consequently, it would probably be necessary to prove, through evidentiary submission, the manner in which the defendants treated individual member hospitals. Such litigation would likely require that member hospitals provide discovery and trial testimony by their officers and employees. Nevertheless, concluded the Third Circuit, such participation would not constitute participation by "each injured party" in the suit and run afoul of the third prong of the *Hunt* test.

■ We believe that the approach of the Third Circuit is a sound one.[24] We can

---

**23.** The complaint alleged that the Council was a Pennsylvania non-profit corporation that functions as a membership organization representing, assisting, and speaking for its members in matters where joint action is appropriate.

**24.** While the reported decision does not permit full assessment, the decision of the Tenth Circuit

in *Kansas Health Care Ass'n v. Kansas Department of Social & Rehabilitation Services,* 958 F.2d 1018 (10th Cir.1992), may be in some tension with the approach of the Third Circuit. In that case, two health care associations sought a preliminary injunction against the Kansas Department of Social & Rehabilitation Services.

discern no indication in *Warth, Hunt,* or *Brock* that the Supreme Court intended to limit representational standing to cases in which it would not be necessary to take any evidence from individual members of an association. Such a stringent limitation on representational standing cannot be squared with the Court's assessment in *Brock* of the efficiencies for both the litigant and the judicial system from the use of representational standing. Rather, the third prong of *Hunt* is more plausibly read as dealing with situations in which it is necessary to establish "individualized proof," 432 U.S. at 344, 97 S.Ct. at 2442, for litigants not before the court in order to support the cause of action.[25]

▮ Finally, we note that, while the third prong of the *Hunt* test requires that we conclude that "neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit," *Hunt,* 432 U.S. at 343, 97 S.Ct. at 2441, associational standing does depend "in sub-

---

The health care associations represented a total of 335 nursing facilities located in Kansas. Their members participated in the federally funded Kansas Medicaid Program and received reimbursement for health care services provided for eligible medicaid recipients. The Kansas agency (SRS) calculated each health care provider's reimbursement rate by focusing on its historical costs and also considered where those costs fell in a percentile comparison with costs reported by other providers.

SRS implemented a rate freeze and prior to the rate freeze each facility submitted two cost reports during each fiscal year and SRS adjusted its reimbursement rate for each facility to reflect the most current cost report. However, under this new plan, SRS would no longer readjust reimbursement rates based on cost reports. Rather, it would determine each facility's rate of reimbursement on the basis of the facility's last cost report filed before October 1, 1990.

Plaintiff-associations brought an action seeking a preliminary injunction against the two state plan amendments. Proceeding as representatives of their members, the associations contended that, although SRS made assurances to the federal government, the findings made by SRS under the amendments did not support the assurances that were made and did not comply with federal law. They also contended that the reimbursement rates established by SRS were substantially deficient. They claimed that the rates were not adequate and reasonable to meet the costs of efficiently and economically operated facilities.

The Tenth Circuit held that the third prong of the *Hunt* test had not been met. The court acknowledged that individual participation might *not be necessary* with respect to the requested relief of a preliminary injunction. However, the court noted that, under the *Hunt* test, an association has standing only if " 'neither *the claim asserted* nor the relief requested requires the participation of individual members in the lawsuit.' " *Kansas Health Care,* 958 F.2d at 1022 (quoting *Hunt,* 432 U.S. at 343, 97 S.Ct. at 2441).

The court conceded that, under some circumstances, a court may be able to make a cursory review of a reimbursement system and determine that *reimbursement rates are not adequate.* It also noted that, in an earlier case, the district court had been able to conclude, with minimum participation of individual providers, that the reimbursement system was inadequate. By contrast, the court here stated, "we will be required to examine evidence particular to individual providers. For example, to determine whether a 4.8% inflation rate insufficiently accounts for increased costs incurred by providers, we simply will be forced to review evidence that pertains to individual providers." 958 F.2d at 1022–23. The court also indicated that it was open to the government to show that some facilities might not be efficiently operated.

With respect to the plaintiffs' claim that SRS had failed to make the findings required by federal law, the district court held that it would have to review these procedural findings and scrutinize specific health care providers who were not parties to the action. The district court simply could not review these inferences adequately by looking solely at the data processed and produced by the state. Thus, the third prong of *Hunt* had not been satisfied.

To the extent that *Kansas Health Care*'s methodology differs from that of the Third Circuit, we believe that the Third Circuit's approach is the preferable one.

25. In *Southwest Suburban Board of Realtors, Inc. [SSBR] v. Beverly Area Planning Ass'n,* 830 F.2d 1374 (7th Cir.1987), this court was faced with an action by a trade association of real estate brokers alleging that the defendant had conspired to monopolize real estate brokerage transactions in violation of the antitrust laws. We noted, albeit in dicta, that SSBR might not be able to meet the third part of the *Hunt* test. We noted that, in *Cargill v. Monfort of Colorado, Inc.,* 479 U.S. 104, 107 S.Ct. 484, 93 L.Ed.2d 427 (1986), the Supreme Court had held that section 16 plaintiffs must demonstrate a threat of antitrust injury. Establishing antitrust injury therefore involved complex questions of fact and required proof of actions taken by the defendants against individual SSBR members. We held that it was "likely that considering the nature of the antitrust injury alleged here, the claims asserted by SSBR would require the participation of individual members in the lawsuit." *Southwest Suburban,* 830 F.2d at 1381.

stantial measure on the nature of the relief sought." *Warth,* 422 U.S. at 515, 95 S.Ct. at 2213. Declaratory, injunctive, or other prospective relief will usually inure to the benefit of the members actually injured and thus individualized proof of damages is often unnecessary. *Id.*

We believe that the present case, at least with respect to the contractual claim, is very close to the situation that confronted the Third Circuit in *Hospital Council.* In that case, at issue was whether the defendant governmental entities had pursued the policy of which the plaintiffs complained; the court believed that issue could be answered through the evidence submitted by, among others, some of the parties. Here, the issue is whether the City made certain binding representations with respect to its health care funding obligations. Recovery would not require that each and every member of the RCPA establish that he was the recipient of a misrepresentation by the City or the Police Fund.[26] The RCPA would have to establish, through circumstantial evidence, that the alleged breach occurred. This evidence might be supplied by the evidentiary submissions of some of the members. Each annuitant's presence as a party would not be required.

## 2. Conflicts of interest

Because we believe that the district court employed an inappropriate methodology in assessing whether the RCPA may maintain this action on behalf of its own members, that court will have to address this issue once again on remand. At that time, it will no doubt have to confront the problem that it addressed with respect to the matter of class action representation under Rule 23—whether the existence of conflicts of interest within the group preclude the RCPA from acting in this capacity. While the inquiry with respect to Rule 23 and the inquiry with respect to associational standing have many similarities, as Judge Bork noted in *National Maritime Union of America v. Commander, Military Sealift Command,* 824 F.2d 1228, 1233

(D.C.Cir.1987), the Supreme Court's decision in *Brock* makes clear that different factors must be weighed in each case. Because it appears inevitable that the district court will have to confront this issue, we believe considerations of judicial economy counsel that we address it at this point.

The circuits have not been uniform in their approach to the presence of conflicts of interest in an association seeking standing. Indeed, they have elected to analyze the problem under various parts of the *Hunt* test. We shall review the major contributions by the various circuits and then articulate what appears to us to be the proper course for the district court upon remand.

Some circuits appear to take the view that a conflict of interest among group members is not relevant to whether associational standing ought to be permitted. In *Associated General Contractors of California v. Coalition for Economic Equity,* 950 F.2d 1401 (9th Cir.1991), *cert. denied,* —— U.S. ——, 112 S.Ct. 1670, 118 L.Ed.2d 390 (1992), the court expressed the view that the third prong of the *Hunt* test did not require the absence of any actual or potential conflict among the organization's members. *Id.* at 1408. It could find no basis for such an inquiry in the Supreme Court's pronouncements in *Hunt* or *Brock. Id.* Furthermore, it believed that the Supreme Court had implicitly rejected the argument in *Brock* when it distinguished the requirements for Rule 23 class certification from the requirements for group standing. It noted that the *Brock* court had contrasted the ad hoc nature of a Rule 23 class assembled for the sole purposes of litigation and the strengths of a pre-existing group that can "draw upon a pre-existing reservoir of expertise and capital." *Id.* at 1409 (quoting *Brock,* 477 U.S. at 289, 106 S.Ct. at 2532). The court noted that, while the Supreme Court in *Brock* had acknowledged the possibility that some organizations would not always be able to represent all of their members, such an eventuality, when it arose, could be solved by denying issue preclusion against the members not adequately

---

26. We do not, of course, mean to imply that recovery is justified or even that the plaintiff's action states a claim upon which relief can be

granted. These issues have yet to be reached by the district court.

represented or by fashioning some other remedy short of requiring unanimity of interest. *Id.* (citing *Brock,* 477 U.S. at 290, 106 S.Ct. at 2533). The court also stated that requiring unanimity among the group's membership would, as a practical matter, terminate the viability of group representation because most groups are organized for purposes far broader than the subject matter of a particular lawsuit, and the presence of some dissident members is inevitable. Accordingly, it held that:

> [A]n organization's internal conflicts properly should be resolved through its own internal procedures, not through limitations on standing. Our ruling should not be deemed to allow the silencing of dissenters' voices within an organization: the interests of these dissenters should be taken into account either through liberal approval of their intervention in the lawsuit or, as the *Brock* Court suggested, through refusal to preclude subsequent claims by dissenting members.

*Id.* at 1409.

The District of Columbia Circuit also appears to follow this view. In *National Maritime Union,* 824 F.2d at 1228, the court was confronted with an action brought by three unions to enjoin the performance of a contract awarded to a particular company by the Military Sealift Command. The unions alleged injury to their members and attempted to sue as representatives of those members. In applying the *Hunt* test, the court addressed the contention that the unions lacked standing because the employees they sought to represent had conflicting interests in the outcome of the litigation. The court frankly noted that this contention "may be seen as an attempt to add a fourth factor to those specified by *Hunt* or as an aspect of the third." *Id.* at 1232. To address this concern, the District of Columbia Circuit determined that "associational standing does not necessarily depend upon harmony of member interests." *Id.*

First of all, it was of the view that the Supreme Court had decided the issue in *Brock.* Judge Bork noted that, in *Brock,* the Supreme Court had stated that the inability of an association to represent adequately all injured members could be handled by not permitting a resulting judgment to preclude subsequent claims by the association's members who had not been adequately represented. He noted that *Brock* had said: "Should an association be deficient in this regard, a judgment won against it might not preclude subsequent claims by the association's members without offending due process principles." *Id.* at 1233 (quoting *Brock,* 477 U.S. at 290, 106 S.Ct. at 2533). Judge Bork continued by noting that the Supreme Court "appeared to deal with the problem of conflicting interests by saying that associational standing was too valuable to jettison and offering possible safeguards for members whose interests were adverse to the litigating position taken by the association." *Id.* at 1233. He further stated that, to the degree there was any ambiguity in the Supreme Court's holding in *Brock* and the court of appeals was free to address the issue as a matter of first impression, the result suggested by *Brock* was the correct one.

> Most, or perhaps all, associations, even though created to serve the members' common interests, will have internal conflicts about appropriate organizational policies. Such conflicts are typically resolved by the association's internal procedures or political structure. Inevitably, some resolutions will harm some members' interests, but that is usually accepted as part of the cost of obtaining the benefits of association. Courts would ordinarily uphold an association's determinations against internal challenge unless it were shown that the organization's own procedures had been violated. It is not obvious to us that this rationale should not apply to an association's internal resolution of conflicts about litigating positions.

*National Maritime Union,* 824 F.2d at 1233. Allowing group standing under these circumstances, Judge Bork wrote, did not mean that the rights of the individual members whose interests did not conform to the position of the group ought to be forgotten. He noted that such individuals, if they had standing, could intervene to advance their interests against the association's position on the merits. He also indicated that it might

be possible for such members to challenge the association's standing by showing that the group's internal procedures for adopting the position had been ignored.

The same theme was articulated by the Third Circuit in *Hospital Council of Western Pennsylvania*, 949 F.2d at 83. In that case, it had been suggested that the interests that the organization sought to promote were adverse to those of some of the members because some members may have wished to benefit from the favorable treatment allegedly given by the defendant state agencies to institutions entering into agreements to make payments in lieu of taxes. Relying on its earlier decision in *Contractors Ass'n v. City of Philadelphia*, 945 F.2d 1260 (3d Cir. 1991), the court held that the association had standing to assert its claim. The court also noted that in the case before it, there was no basis for concluding that those council members who had entered into such agreements felt that the relief sought in the lawsuit would not be beneficial. The court noted that, while it was possible that such member hospitals might prefer to continue making payments in exchange for favorable treatment, it was also possible that they might prefer to stop making the payments.

The Third Circuit's earlier case, *Contractors Ass'n*, is helpful in understanding the considerations at issue when conflicts of interest arise because, in that case, the Third Circuit directly confronted with more elaboration the impact of conflicts among members on an organization's standing. The Contractors Association of Eastern Pennsylvania, together with other trade associations, had challenged Philadelphia's public contract set-aside law as violative of the equal protection clause of the Fourteenth Amendment. Some of the Contractors Association's members qualified as disadvantaged businesses and actually opposed the litigation, thus the conflict of interest existed within the association itself. The court acknowledged that, in *Polaroid Corp. v. Disney*, 862 F.2d 987, 999 (3d Cir.1988), it had stated that "associational standing has never been granted in the presence of serious conflicts of interest either among the members of an association or between an association and its members."

*Polaroid* addressed whether a target corporation had standing to assert the interests of the shareholders in a hostile takeover. The court noted two possible conflicts that could prevent the target corporation from seeking standing on behalf of the shareholders. First, there was a conflict between management who might seek to defeat the takeover and remain in control and the shareholders who could profit from the tender offer. The second conflict was between the shareholders who might profit from the tender offer (normally the majority of shareholders) and the target corporation when the corporation sides with the shareholders who will be harmed by the tender offer (normally the minority shareholders). Nevertheless, it did not believe that *Polaroid* was controlling. It noted that only 29 of the 535 members of the association were members of the disadvantaged group and, therefore, there was no question that the association was representing the majority of its members. Under these circumstances, noted the court, there was little chance that the conflict between the majority and minority contractors would either affect the adequacy of representation or would present the possibility of a collusive suit.

> When an association has not violated its members' rights by ignoring the association's by-laws before bringing an action on a matter of concern to the membership, it is primarily concern over the absence of strong advocacy on both sides of a controversy that has motivated courts to hold that a conflict of interest among its members deprives an association of associational standing.

*Contractors Ass'n*, 945 F.2d at 1265. Because the position of the Contractors Association was not contrary to the interests of a majority of its members, and there was nothing on the record to indicate that they had failed to follow their own internal rules before joining the litigation, the perceived conflict of interest did not bar associational standing.

The Court of Appeals for the Fourth Circuit has taken what, at least at first glance, might seem to be a contrary position. In *Maryland Highways Contractors Ass'n v.*

*Maryland*, 933 F.2d 1246 (4th Cir.), *cert. denied*, —— U.S. ——, 112 S.Ct. 373, 116 L.Ed.2d 325 (1991), the plaintiff association sought declaratory and injunctive relief against Maryland on the ground that the state's "Minority Business Enterprise" (MBE) statute and its accompanying regulations violated the constitutional and statutory rights of the association and its members. Although the court dismissed the case as moot, it went on to hold that the association lacked standing to bring the action on behalf of its members. The court held that the association had failed to meet the third requirement of *Hunt.* The court stated that the third prong could not be met when "conflicts of interest among members of the association require that the members must join the suit individually in order to protect their own interests." *Id.* at 1252. The court noted that some of the members of the association were certified MBE's and therefore benefitted from the continued enforcement of the MBE statute; other non-minority members of the association would benefit if the statute were declared unconstitutional. Thus, there were actual conflicts of interest that required individual members to come into the lawsuit to protect their interests.

The court also noted that the decision to litigate in this case had been made by the association's Board which did not have a MBE representative. The Board had also taken the unusual position of not telling the members of its decision to litigate until after the suit had already been filed. This secrecy, noted the Fourth Circuit, raised suspicion with respect to the motives of the association. *Id.* at 1253. Therefore, "[b]ecause of the actual conflict of interest and the potential for conflict in this case, the Association has failed to meet the third prong of the *Hunt* test." *Id.*

In our own circuit, we have addressed this problem in *Southwest Suburban Board of Realtors, Inc. v. Beverly Area Planning Ass'n*, 830 F.2d 1374 (1987). The SSBR, a trade association of real estate brokers, brought an action charging that the defendant neighborhood planning association, certain of its employees and volunteers, and certain real estate brokerage entities had conspired to control and monopolize real estate transactions in violation of the antitrust laws. The SSBR contended that it had standing to maintain an antitrust action against the defendants on two grounds. First, it argued that it had proprietary standing under section 4 of the Clayton Act to seek treble damages because it had sustained an injury. Second, it argued that it had representational standing under the *Hunt* test. We held that the *second* prong of the *Hunt* test, the so-called "germaneness" test, had not been satisfied. The alignment of the parties in the action evidenced, the court held, a serious conflict in SSBR's interest. 830 F.2d at 1380. At least three of the named real estate brokerage defendants were members of SSBR, and thus SSBR was in effect suing certain of its members on behalf of other members. Judge Cummings, writing for the court, held that

> [i]f SSBR were permitted to pursue this action and were ultimately successful in obtaining the requested injunctive relief, its defendant members would without question be adversely affected and perhaps even seriously disadvantaged by the strictures of the injunction. That the remedy sought may directly affect certain members of SSBR gives rise to both actual and potential conflicts of interest among the members as a group, with the result being that their interests demand individual, not associational, representation.

*Southwest Suburban Realtors*, 830 F.2d at 1381.

The approach of the Fourth Circuit in *Maryland Highways* and of this court in *Southwest Suburban* is no doubt best explained by a close examination of the facts of these two cases. In both situations, the conflict of interest among the members was profound. In *Maryland Highways*, the suit not only worked to the direct detriment of the minority members of the Association, but was undertaken by the Association without observance of its own by-laws. In *Southwest Suburban*, Judge Cummings noted that "what this suit amounts to is SSBR suing certain of its members on behalf of other of its members." 830 F.2d at 1381. The court

noted that at least three of the defendants were members of SSBR.

Indeed, it is not without significance that Judge Cummings analyzed the conflict of interest problem not under the third prong of the *Hunt* test, but under the so-called "germaneness" test of the second prong. This second prong has received little elaboration by the Supreme Court. However, our colleagues in the District of Columbia Circuit have suggested that *Brock* provides significant guidance for its use. The Supreme Court's recognition in *Brock* of the special advantages offered by associational suits signals, wrote the District of Columbia Circuit in *Humane Society v. Hodel*, 840 F.2d 45 (D.C.Cir.1988),

> the importance of a reading of the germaneness requirement that does not unduly confine the occasions on which associations may bring legal actions on behalf of members and thus significantly restrict the opportunities of associations to utilize their "specialized expertise and research resources" relating to the subject matter of the lawsuit.

*Id.* at 56 (quoting *Brock*, 477 U.S. at 289, 106 S.Ct. at 2532). The District of Columbia Circuit reasoned that, if the

> "forces that cause individuals to band together" guarantee some degree of fair representation, they surely guarantee as well that associational policy-makers will not run roughshod over the strongly held views of association members in fashioning litigation goals.

*Humane Society*, 840 F.2d at 56 (quoting *Brock*, 477 U.S. at 290, 106 S.Ct. at 2533). It would appear, concluded the District of Columbia Circuit, that the germaneness test simply requires that "an organization's litigation goals be pertinent to its special expertise and the grounds that bring its membership together." *Id.* (footnote omitted). This expansive definition of "germaneness" in *Hodel* carries within it its own limitations—limitations that are reached in *Maryland Highways* and *Southwest Suburban* because it was clear in those cases that the associations

were not really operating along the lines for which they had been organized. In each case, they were operating as less permanent structures merely for litigation purposes and not for the purposes stated in their charters.

On remand, we believe that the district court must begin, as did we, with the pronouncement in · *Brock*. In determining whether representational standing is appropriate with respect to any of the counts in the complaint,[27] the court must evaluate the specific circumstances of this case in light of the characteristics of preexisting groups in the conduct of litigation set forth in *Brock*. It must determine whether those characteristics sufficiently outweigh whatever deficiencies it identifies in the RCPA for purposes of standing. With respect to the issue of actual and potential conflicts, it must assess whether, as *Brock* teaches, other approaches less drastic than denying group standing, will provide adequate protection for the interests of those whose position is not represented by the group, while affording the group and the judicial system as a whole the efficiencies that *Brock* has identified in associational standing. We are aware that the district court has already engaged in a similar inquiry with respect to the class action issue. But, as *Brock* makes plain, the inquiry with respect to associational standing, while similar, is not identical but tailored to the capacities of this particular form of litigation.

## E. *Denial of Preliminary Injunction*

█ Several times in the course of this lengthy litigation, the appellants sought preliminary injunctions from the district court. In February 1990, the RCPA brought its first motion for a preliminary injunction to keep the City from altering the rates charged for its health care plan during the litigation. This motion was referred to a magistrate judge who continued RCPA's motion on assurances by the City that it would not raise the rates for the RCPA claimants without notifying plaintiff's lead counsel. *See* R. 30. Despite these assurances, in October 1991, the City determined that it would

---

**27.** It would appear that the supplemental state law claim based on estoppel would require "individualized proof" and therefore could not be maintained by a group suing on behalf of its members.

change the rates charged for health care coverage under the plan for the RCPA class. The RCPA once again sought a preliminary injunction, but the motion was denied, as was the RCPA's request for reconsideration. On November 12, 1991, the City reiterated its intent to alter its health care plan. Again the RCPA filed a motion for preliminary injunction; the district court delayed ruling on the motion and the City's new plan went into effect on January 1, 1992. The RCPA's final motion for preliminary injunction was denied on March 25, 1992, after the court had dismissed the RCPA's complaint. The district court simply issued an order denying all of the RCPA's pending motions, but before judgment was entered. R. 273.

As a prefatory note, the City and the Funds contend that the denial of the motion for preliminary injunction is unreviewable by this court. They invite our attention to the timing of the RCPA's appeal from the denial: the motion from which the RCPA appeals was denied on October 8, 1991, while the notice of appeal was filed on May 29, 1992. Focusing their attention on the relevant dates, the City and the Funds assert that the denial was appealable as of right under 28 U.S.C. § 1292(a)(1)[28] and as such, should have been appealed immediately within the thirty-day time limit of Rule 4(a) of the Federal Rules of Appellate Procedure. The City thus contends that the RCPA cannot now appeal the district court's denial of the RCPA's motion for preliminary injunction.

■ Although an order denying a preliminary injunction is immediately appealable as an interlocutory decision under 28 U.S.C. § 1292(a)(1), an immediate appeal nonethe-

less is not mandated by the statute. A party may forgo an interlocutory appeal and present the issue for appeal after final judgment. "Interlocutory orders therefore may be stored up and raised at the end of the case...." *Kurowski v. Krajewski*, 848 F.2d 767, 772–73 (7th Cir.), *cert. denied*, 488 U.S. 926, 109 S.Ct. 309, 102 L.Ed.2d 328 (1988).[29] Consequently, the RCPA has not waived its right to appeal the denial of its motion for preliminary injunction.

■■ In reviewing a denial of a motion for preliminary injunction, we "apply the clearly erroneous standard to any factual determinations; necessary legal conclusions are subject to de novo review." *In re L & S Indus., Inc.*, 989 F.2d 929, 932 (7th Cir.1993). A party seeking a preliminary injunction bears the burden of demonstrating: (1) an absence of an adequate remedy at law; (2) irreparable harm in the absence of an injunction exceeding the irreparable harm the other side will suffer if the injunction issues; (3) a reasonable likelihood of success on the merits; and (4) harm to the public interest that stems from the injunction and is tolerable in light of the benefits achieved by the relief. *West Allis Memorial Hosp., Inc. v. Bowen*, 852 F.2d 251, 253 (7th Cir.1988).

The district court held that none of the classes could be certified, that none of the movants could be allowed to intervene, and that the RCPA had no standing to assert the claims of its members. Today, we affirm all of these determinations except that the RCPA ought to be given the opportunity to demonstrate that it has associational standing to represent its members. Unless and

---

**28.** This section provides in pertinent part:

(a) Except as provided in subsections (c) and (d) of this section, the courts of appeals shall have jurisdiction of appeals from:

(1) Interlocutory orders of the district courts of the United States ... granting, continuing, modifying, refusing or dissolving injunctions, or refusing to dissolve or modify injunctions, except where a direct review may be had in the Supreme Court....

28 U.S.C. § 1292(a)(1).

**29.** *See also SEC v. Quinn*, 997 F.2d 287 (7th Cir.1993) (stating that parties are not obligated to seek immediate review of interlocutory orders under § 1292(a)(2)); 9 James W. Moore et al.,

*Moore's Federal Practice* ¶ 110.18 (stating that "[i]f matters are adjudged by an interlocutory decree that is subject to immediate appeal, and no appeal is taken, they are not foreclosed, but are subject to review on appeal from the final judgment"). "[E]ven those [decisions] producing interlocutory 'judgments' (such as the denial of a preliminary injunction) receive the same treatment." *Kurowski*, 848 F.2d at 772; *accord United States v. Clark*, 445 U.S. 23, 25 n. 2, 100 S.Ct. 895, 899 n. 2, 63 L.Ed.2d 171 (1980) (noting that under 28 U.S.C. § 1252 government was allowed to seek immediate review of interlocutory order, but was not required to do so prior to entry of final judgment).

until that matter is resolved in favor of the RCPA, it cannot demonstrate a reasonable likelihood of success on the merits of its claims; therefore, the district court did not err in denying the motion for preliminary injunction.

## Conclusion

For the foregoing reasons, we affirm the judgment of the district court in part and reverse and remand in part.[30]

AFFIRMED IN PART AND REVERSED AND REMANDED IN PART.

**30.** Various parties have filed motions with the court inviting our attention to supplemental authority. This court can take judicial notice of the decisions of federal and state courts. The motions are denied as moot.