(No. 72519.—

THE PEOPLE OF THE STATE OF ILLINOIS *ex rel.*
ROLAND BURRIS, Attorney General of Illinois, Appellant, v. PROGRESSIVE LAND DEVELOPERS, INC., *et al.*, Appellees.

*Opinion filed October 15, 1992.*

286

Roland W. Burris, Attorney General, of Springfield (Rosalyn B. Kaplan, Solicitor General, and Floyd D. Perkins, Matthew D. Shapiro and Thomas P. James, Assistant Attorneys General, of Chicago, of counsel), for appellant.

Rufus Cook, of Cook Partners Law Offices, Ltd., of Chicago, for appellees.

JUSTICE CLARK delivered the opinion of the court:

Appellant, the Illinois Attorney General, appeals the dismissal of an action filed against appellee, Progressive

Land Developers, Inc. (Progressive), attempting to recover charitable assets on a theory of unjust enrichment. The chancery lawsuit was brought in the circuit court of Cook County to impose a constructive trust on the assets titled to Progressive. Progressive filed a section 2—619 motion (Ill. Rev. Stat. 1989, ch. 110, par. 2—619) to dismiss the Attorney General's action alleging that the unjust enrichment suit was barred by *res judicata, laches,* estoppel and the statute of limitations. The trial court granted the motion, and the appellate court affirmed on the grounds of *res judicata* and *laches.* (216 Ill. App. 3d 73.) We granted the Attorney General's petition for leave to appeal (134 Ill. 2d R. 315). We conclude that since the prerequisites of *res judicata* are present, the doctrine applies and bars this action. We do not reach and intimate no view upon the appellate court's conclusion with respect to *laches* and accordingly confine our recitation of the facts to those relevant to disposition of the issue of *res judicata.*

The following facts were alleged in the verified complaint filed in the unjust enrichment suit. Elijah Muhammad was the leader of the charitable religious movement known as the Nation of Islam (the Nation) until his death in 1975. Muhammad's Mosque No. 2 (the Mosque) is an Illinois not-for-profit corporation. Its several affiliated unincorporated entities devoted to charitable and religious purposes include the Council of Imans of the American Muslim Mission (the Council of Imans) and the World Community of Al-Islam in the West (Al-Islam).

According to the complaint, a substantial portion of Progressive's assets consisted of funds that were transferred from the bank accounts and treasury funds of the Nation during Elijah Muhammad's lifetime. The funds were composed of charitable contributions solicited from the Nation's members and its affiliated entities and consisted in large part of donations from a treasury known

as "Elijah Mohammad's Number Two Poor Fund Treasury." By these actions, funds and monies of the Nation were commingled with Progressive's assets, which were in turn used to purchase real estate titled to Progressive.

The complaint alleged that Progressive had no equitable rights to the assets and was being unjustly enriched by possession of them. Among other equitable relief, the lawsuit sought to impose a constructive trust on the assets held by Progressive.

Elijah Muhammad died intestate in 1975 and a probate estate was opened that year. On October 24, 1980, several of Elijah Muhammad's heirs filed a 12-count petition for recovery citations to recover property for the estate. (Ill. Rev. Stat. 1989, ch. 110½, par. 16—1 et seq.) A central issue bearing on all of the claims was whether certain funds held by Elijah Muhammad during his lifetime, and purchases made in part with those funds, constituted assets which belonged to his estate or to the religious group which he led. Count I sought a citation to recover assets from the First Pacific Bank of Chicago for the transfer of the Poor Fund Treasury account to persons other than the estate. The amount sought by the estate was in excess of $3 million.

The trial of count I commenced on October 5, 1981. The First Pacific Bank of Chicago filed counterclaims and third-party complaints for indemnification against the Nation and named the Attorney General as a party on the theory that the People of the State of Illinois were the ultimate beneficiaries and parties in interest of the charitable assets held in the various bank accounts. Summons was served on the Attorney General on May 5, 1981.

On May 27, 1981, the Attorney General filed a general appearance in the probate proceedings. On July 7, the Attorney General filed an answer to the Bank's com-

plaint and subsequently participated fully in the count I litigation. The trial resulted in an entry of judgment for the estate. The judgment was reversed by the appellate court and remanded for a new trial. *In re Estate of Muhammad* (1984), 123 Ill. App. 3d 756.

A new trial commenced in 1986 which resulted in a judgment for the estate. Again, the appellate court reversed the judgment and held that the monies in the Poor Fund Treasury account were not the personal property of Elijah Muhammad, but were in fact charitable assets. *In re Estate of Muhammad* (1987), 165 Ill. App. 3d 890.

At the time litigation in count I was proceeding, other action was being taken by the estate with respect to the disputed Progressive assets. On January 11, 1983, Progressive, by action of Emanuel Muhammad, acting as a shareholder of Progressive and in his capacity as administrator of the estate, filed the administrator's first petition for recovery citation as a supplemental proceeding for citation (the petition). The Attorney General was not served with a copy of the petition, nor was he joined as a respondent. He did, however, receive copies of the petition in the mail.

The petition alleged that Elijah Muhammad had been a shareholder of Progressive and sought recovery of the stock of Progressive from, among others, the Nation, the Mosque, and Al-Islam. It further recited that at the time of his death, Elijah Muhammad and his sons owned all of Progressive's stock and that the Nation had improperly seized control of Progressive, sold substantial portions of its assets and misappropriated the proceeds. The petition sought the return of funds and assets which had been distributed or misused as well as the ouster of various persons whom the Nation had purported to name as Progressive's officers and directors following Elijah Muhammad's death.

On July 22, 1983, the respondents filed an amended answer to the petition. The answer alleged that Progressive was formed by Elijah Muhammad "with the sole intent of furthering the Nation's growth." It further alleged that "the Nation was intended to be the sole shareholder of [Progressive]. Money to form, finance, and operate [Progressive] came from the members of The Nation who lived throughout the United States."

A copy of the amended answer was mailed to the Attorney General. The petition was subsequently amended three times prior to trial in 1984. The Attorney General did not receive copies of the amended petition, including a copy of the third-amended petition on which the trial was based. Further, the Attorney General did not receive copies of any of the filings in the matter after September 21, 1983, including the post-trial filings and motions.

At trial, during cross-examination of one of Progressive's witnesses, respondents attempted to establish that the accounts of the various religious groups which consisted of charitable donations were the source of the monies which Elijah Muhammad used to purchase Progressive's assets. Progressive objected to the line of questioning. Arguments were made by both parties on the objection, with the respondent making clear that its theory of the case was that the assets titled to Progressive were held by Progressive in a resulting or constructive trust for the benefit of the religious charities.

The trial court concluded, however, that the respondent's pleadings were defective with respect to arguing as a defense the creation of a constructive trust. Specifically, the court noted that the respondents' pleadings were conclusory and failed to plead facts demonstrating a constructive trust:

"COURT: [A constructive trust defense may be argued] [p]rovided that proper pleadings have been filed. There have been no affirmative defenses to it.

And basically the question before the Court is the ownership of these properties; legal title to the properties, not the equitable ownership.

You may have a good theory but there is nothing in the pleadings to indicate that you assert that as a defense.

\* \* \*

Counsel, make an amendment. Look up our Code of Civil Procedure. It's section 2—619, 617, right in there. And look at the amendments and pleadings. And if you come in with a theory of your cause of action, the Court will entertain it then."

The court then sustained Progressive's objection to the respondent's line of cross-examination. At this point, however, Progressive withdrew its relevancy objection. Thus, testimony concerning the source of the funds used to purchase the properties titled to Progressive was presented and litigated during the petition trial.

According to the testimony of two former Nation officials, the money used to purchase Progressive's assets came in large part from donations from Nation members. One of the former officials testified that some of Progressive's properties had been purchased with the Nation's own funds and that the funds used by Elijah Muhammad were in fact from the Poor Fund Treasury account.

The following day, before the trial resumed, respondents again requested the court to consider its pleadings sufficient to plead a constructive or resulting trust as a defense. The court remarked that the respondents' pleadings were "too broad an allegation," but then reconsidered and made the following ruling:

"COURT: I am not saying that you cannot proceed on your theory, all I am saying is that you need some facts

which will support your theory. I, now directed you to that section which says about amendment to pleadings—

* * *

Let me tell you what you do, Counsel, *you present your evidence*, and the Court will consider what Counsel's objection is and the Court will make a ruling.

But I am not saying you don't have a right to show a resulting trust because the case law without you even showing me I know what the case law is the intent of the parties at the time of the transfer was made." (Emphasis added.)

On November 21, 1986, final judgment for the estate was entered in the petition litigation. The court specifically found that Progressive was formed in large part with funds from the Poor Fund Treasury account and that the monies in the account were the personal property of Elijah Muhammad. For instance, the court's findings included the following:

"6. In 1961, *** the National Secretary of the religious corporation, organized the Temple No. 2 Poor Fund as a treasury to which persons wishing to make donations to [Elijah Muhammad] personally could contribute. *** [T]he fact that funds so contributed were contributed to [Elijah Muhammad] personally, were both communicated in the publications of the religious group, ***.

7. In early 1972, [Elijah Muhammad] directed [officials] to open an account at the First Pacific Bank of Chicago, to hold his personal funds. ***

8. From 1963 to February 25, 1975, properties acquired by [Progressive] were purchased with funds from the [Poor Fund Treasury account], from the bank account known as the Elijah Muhammad Poor fund, and with funds supplied by Elijah Muhammad from other sources. *** [T]he preponderance of the credible evidence was to the effect that there was no comingling of funds or use of Respondents' funds to purchases Progressive assets."

The notice of appeal filed by the respondents was dismissed as untimely and the petition for appeal was de-

nied. Progressive moved to enforce its judgment in February 1987, but on March 6, 1987, the Mosque filed a Chapter 11 bankruptcy petition. Seventeen months later, the bankruptcy case was dismissed for want of equity and dissipation of assets.

Subsequent to the dismissal of the bankruptcy petition, and after the Mosque and Progressive executed a settlement agreement, the verified complaint was filed in the instant matter. On February 14, 1989, Progressive filed a section 2—619 motion to dismiss the Attorney General's action contending that (1) the Attorney General was barred by the probate court ruling in the count I litigation as both an actual party thereto and as a privy of the Nation; (2) the pleadings in the petition proceedings that the Attorney General received in the mail were sufficient to notify him that the issue of equitable as well as legal title to Progressive's assets would be adjudicated in that proceeding; and (3) the Attorney General was guilty of *laches* for not seeking to assert charity's interest while the litigation in the petition proceeding was still in the probate court.

In an order dated May 19, 1989, the trial court granted Progressive's motion and dismissed the cause. The Attorney General filed a motion to reconsider on June 19, 1989, which was denied in an order entered on May 4, 1990.

In an opinion filed on June 20, 1991, the appellate court affirmed the dismissal on the grounds of both *res judicata* and *laches*. With respect to the doctrine of *res judicata*, the court concluded that the defense presented by "the Nation [of Islam] in the [petition] proceeding and the claim made by the Attorney General in the instant litigation are the same, *i.e.*, that monies used to form Progressive came from the members of the Nation and therefore constituted charitable assets. Thus, both lawsuits arose out of the same group of operative facts and

involved the same claim or demand regarding the ownership of Progressive." 216 Ill. App. 3d at 80.

On appeal, the Attorney General argues that the trial and appellate courts incorrectly concluded that *res judicata* applies to bar his lawsuit. The Attorney General argues that he was not a privy of the Nation; that he was not a party to the petition proceeding; and that his chancery action did not embody the same cause of action as the petition proceeding.

Under the doctrine of *res judicata,* a final judgment on the merits rendered by a court of competent jurisdiction is conclusive as to the rights of the parties and their privies. (*Kinzer v. City of Chicago* (1989), 128 Ill. 2d 437, 446; *Catlett v. Novak* (1987), 116 Ill. 2d 63; *People v. Kidd* (1947), 398 Ill. 405, 408.) That judgment is an absolute bar to subsequent actions involving the same claims or demands by the same parties or their privies. (*Kinzer v. City of Chicago*, 128 Ill. 2d at 446; *Catlett v. Novak*, 116 Ill. 2d at 67; *People v. Kidd*, 398 Ill. at 408.) The doctrine extends not only to what actually was decided in the original action but also to matters which could have been decided in that suit. *La Salle National Bank v. County Board of School Trustees* (1975), 61 Ill. 2d 524, 529.

The rule deducible from these decisions is that the essential elements of *res judicata* are: (1) a final judgment on the merits rendered by a court of competent jurisdiction; (2) an identity of cause of action; and (3) an identity of parties or their privies. (Accord *Hartke v. Chicago Board of Election Commissioners* (N.D. Ill. 1986), 651 F. Supp. 86, 88.) In other words, if the first suit involved the same cause of action, the judgment in the former suit is conclusive not only as to all questions actually decided but as to all questions which might properly have been litigated and determined in that action. (*La Salle National Bank*, 61 Ill. 2d at 529.) The decision in the

former suit estops the parties and all parties in privity with them from relitigating the issue in a subsequent proceeding.

The first requirement of the doctrine is met here. The merits of an adjudication refer to the substantive rights of the parties. A simple reading of the probate court's opinion in the petition proceeding shows that it fully addressed the merits. The court discussed in detail the origin of the monies used to purchase Progressive's assets, which respondents argued was traced to donations from the Nation's members. Although there was some testimony at trial to support this argument, the probate court concluded that the "preponderance of the credible evidence" demonstrated that the Nation's funds were maintained separately from those of Elijah Muhammad's personal accounts and that it was funds from the latter source which were used to purchase Progressive's assets. Whether the probate court's findings were in fact supported by the evidence is not a proper consideration for our review. Rather, we consider simply whether the court rendered a final judgment on the merits for purposes of *res judicata* and, as we conclude that it did, we find that the first requirement of the doctrine is satisfied.

The second requirement, identity of causes of action, is also met. A cause of action is defined by the facts which give the plaintiff a right to relief. While one group of facts may give rise to a number of different theories of recovery, there remains only a single cause of action. "If the same facts are essential to the maintenance of both proceedings or the same evidence is needed to sustain both, then there is identity between the allegedly different causes of action asserted and *res judicata* bars the latter action." *Morris v. Union Oil Co.* (1981), 96 Ill. App. 3d 148, 157; *Lee v. City of Peoria* (7th Cir. 1982), 685 F.2d 196, 199.

As was noted by the appellate court in this matter, the single group of operative facts common to both cases is that monies used to form Progressive came from the members of the Nation and therefore constituted charitable assets. (216 Ill. App. 3d at 80.) Since the same facts are necessary for the maintenance and proof in both cases, the causes of action are identical. Accord *Hartke*, 651 F. Supp. at 89; see also *City of Elmhurst v. Kegerreis* (1945), 392 Ill. 195, 205.

The final requirement for the application of *res judicata* is that there be an identity of parties or privity. Privity is said to exist between " 'parties who adequately represent the same legal interests.' " (*Hartke*, 651 F. Supp at 90, quoting *Donovan v. Estate of Fitzsimmons* (7th Cir. 1985), 778 F.2d 298, 301.) It is the identity of interest that controls in determining privity, not the nominal identity of the parties (*Smith v. Bishop* (1962), 26 Ill. 2d 434, 440 (Schaefer, J., dissenting)). Referring to the dissent in *Smith*, many appellate court decisions discussing privity for purposes of *res judicata* have relied on the definition found in the Restatement of Judgments:

> "Privity is a word which expresses the idea that as to certain matters and in certain circumstances persons who are not parties to an action but who are connected with it in their interests are affected by the judgment with reference to interests involved in the action, as if they were parties." (Restatement of Judgments §83, Comment *a*, at 389 (1942).)

(*Johnson v. Nationwide Business Forms, Inc.* (1981), 103 Ill. App. 3d 631, 634; *Country Mutual Insurance Co. v. Regent Homes Corp.* (1978), 64 Ill. App. 3d 666, 670.) On the other hand, certain authorities, including the Restatement (Second) of Judgments, have abandoned the term "privy" altogether. *Montana v. United States*

(1979), 440 U.S. 147, 154 n.5, 59 L. Ed. 2d 210, 217 n.5, 99 S. Ct. 970, 974 n.5.

The issue under this requirement is whether the Attorney General's interests were adequately represented by the Nation in the petition proceeding. Did the Nation vigorously urge the probate court that the assets of Progressive were deposited by the members of the Nation and that Progressive merely held them in a constructive trust for the benefit of the Nation? Simply because the trial court rejected the Nation's arguments cannot be evidence of inadequate representation. (*Hartke*, 651 F. Supp. at 90.) The arguments were rejected only after the Nation "briefed and argued at length and with competent counsel" the alleged illegal ownership of Progressive's assets. The extensiveness of the pleadings and the briefing all demonstrate that the Attorney General's interests in demonstrating the Progressive's assets were funded by the members of the Nation were adequately represented.

The three elements of *res judicata* are therefore present in the instant matter. By our conclusion, we reject the Attorney General's arguments that he was not a privy of the Nation and that his chancery action does not embody the same cause of action as the petition proceeding.

For these reasons, we conclude that the requirements of *res judicata* are met and the doctrine applies to bar the Attorney General's action. The judgment of the appellate court is affirmed.

*Affirmed.*