2018 IL App (1st) 180580
No. 1-18-0580, 1-18-0706, 1-18-0759 (cons.)
Opinion filed November 30, 2018

Second Division

_____

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

_____

| | | |
|---|---|---|
| *In re* J.D., a Minor | ) | |
| | ) | |
| | ) | Appeal from the Circuit Court |
| | ) | of Cook County. |
| (The People of the State of Illinois, Petitioner-Appellee; Jaime D., Respondent-Appellee; Viridiana M., Respondent-Appellant; and Alejandro A. and J.D., Appellants). | ) | |
| | ) | |
| | ) | No. 17 JA 1168 |
| | ) | |
| | ) | |
| | ) | The Honorable |
| | ) | Bernard J. Sarley, |
| | ) | Judge, presiding. |

_____

JUSTICE HYMAN delivered the judgment of the court, with opinion.
Justice Pucinski concurred in the judgment and opinion.
Presiding Justice Mason concurred in part and dissented in part, with opinion.

OPINION

¶ 1    After an allegation of abuse by their father, Jaime D., five-year-old J.D. and his two sisters were placed in the temporary custody of the Department of Children and Family Services (DCFS). During the proceeding, a DNA test showed Jaime was not J.D.'s father. J.D.'s mother testified that Alejandro A. was J.D.'s biological father. Based on Jaime having signed a voluntary acknowledgement of parentage (VAP), the trial court named Jaime as J.D.'s father.

The trial judge stated, however, that if Alejandro appeared later and had standing, the court might reconsider the parentage finding. Eventually, the children returned to their mother.

¶ 2    Four years later, in 2017, the State again filed a petition for adjudication of wardship and temporary custody of the children after one of J.D.'s sisters alleged sexual abuse by her mother's boyfriend and the other sister alleged sexual abuse by Jaime, her father. Alejandro appeared and the trial court ordered him to take a DNA test, which established him as J.D.'s biological father. J.D., through the public guardian, filed a petition to allow Alejandro to remain a party and reserve his right to adjudicate Alejandro as his father. Alternatively, J.D. asked the trial court to adjudicate Alejandro as his legal parent.

¶ 3    After briefing and a hearing, the trial court denied J.D.'s request and entered another parentage order naming Jaime as J.D.'s father. The trial court held that the statute of limitations barred Alejandro, but not J.D., from seeking an adjudication of parentage. J.D., though, also could not proceed; *res judicata*, collateral estoppel, and the law of the case doctrine applied due to the public guardian's failure to object to the parentage finding in the 2013 proceeding. The court also denied J.D.'s request that Alejandro remain a party and dismissed him from the case.

¶ 4    J.D. argues (i) he is not barred by the doctrines of *res judicata*, collateral estoppel, or the law of the case from showing parentage in Alejandro; (ii) the statute of limitations does not bar his petition to establish parentage in Alejandro; and (iii) if we affirm the trial court's parentage order, Alejandro should be allowed to remain a party.

¶ 5    We reverse. While we agree the statute of limitations does not preclude J.D., we disagree that either *res judicata* or collateral estoppel applies. (The parties agree, as do we, that the law of the case doctrine does not apply.) Because we are reversing and remanding for further proceedings on J.D.'s petition, we need not address whether Alejandro should remain a party.

¶ 6                                    I. Background

¶ 7        When Viridiana M. gave birth to J.D. her boyfriend, Jaime, signed a VAP. J.D.'s birth certificate also lists Jaime as his father.

¶ 8        J.D. first came into the system in April 2013, when the State filed a motion for temporary custody and a petition for adjudication of wardship for J.D. and his two older sisters. The State alleged Jaime hit one of J.D.'s sisters in the face with a coat hanger, causing lacerations and bruising. The trial court appointed the public guardian to represent the children.

¶ 9        At the initial hearing on the State's petition, Jaime appeared in court; Viridiana, living in Mexico, did not. Jaime testified he was the father of all three children. At the public guardian's request, the trial court ordered Jaime to take a parentage DNA test. The public guardian told the trial court that despite Jaime having taken on that role of father, family members knew Jaime was not J.D.'s father. The public guardian also informed the court that DCFS records included a 2009 DNA test that excluded Jaime as J.D.'s father but showed him as the biological father of J.D.'s sisters.

¶ 10       Jaime testified that a 2009 order required him to pay child support for all three children. The State informed the court that Jaime had been defaulted in the 2009 child support case and he was ordered to pay child support based on the VAP and J.D.'s birth certificate.

¶ 11       Viridiana appeared for the adjudicatory hearing. She testified that Alejandro took a home DNA test two years after J.D's birth, which showed he was J.D.'s biological father. According to Viridiana, she e-mailed Alejandro about the ongoing child protection case and the court date and asked him to attend. She claimed Alejandro said he was scared to come to court. The trial court asked the caseworker to try to locate Alejandro so he could be notified of the proceedings. The court then stated "if there's some reason to believe that [Alejandro] would have standing before

this Court, I would be glad to entertain even his participating in the proceedings, and if necessary, re-adjudicate proceedings *** but *** at this time, it's not in the best interests of these three minors *** to delay adjudication pending what at this point is speculation that [Alejandro] would come to court."

¶ 12    By stipulation, including that Jaime was J.D.'s father, the trial court found neglect due to injurious environment of J.D. and his sisters and removed them from the home. Eventually, the children returned to Viridiana's care.

¶ 13    J.D., his sisters, and a new younger brother came to DCFS's attention in January 2017. One of J.D.'s sisters alleged Viridiana's boyfriend sexually abused her. DCFS placed the children with Jaime, but in November 2017, J.D.'s other sister alleged Jaime sexually abused her. The State filed a petition for adjudication of wardship and a motion for temporary custody of the children. The trial court appointed the public guardian to represent the children.

¶ 14    At the temporary custody hearing, Viridiana testified that Alejandro was J.D.'s biological father. She acknowledged that Jaime attended J.D.'s birth, signed a VAP, and had been responsible for J.D.'s child support in 2009. But, she said, J.D. knew Jaime was not his father and that Alejandro had visits with J.D. in 2011.

¶ 15    Next, the parties appeared before a different judge. After the parties informed the trial judge of the DNA test results, of Viridiana's contention that Alejandro was J.D.'s father, and of the order finding Jaime the father, both Jaime and Alejandro were required to submit to DNA parentage testing.

¶ 16    Later that month, the State admitted the results: Alejandro's DNA test showed a 99.99 percent probability of fatherhood. The State objected to Alejandro's DNA test's admission, arguing that the order in the 2013 proceeding named Jaime the father. The court then proceeded

with a stipulation as to the children's temporary custody and placed them in DCFS custody. Alejandro's attorney sought placing J.D. with Alejandro.

¶ 17     Jaime filed a motion to deny a paternity in Alejandro's favor based on the 2013 paternity finding. The state's attorney also filed a motion to declare Jaime as J.D.'s legal father. J.D. filed a petition to allow Alejandro to retain party status and to reserve his right to adjudicate parentage in Alejandro or, alternatively, to adjudicate Alejandro as his legal guardian.

¶ 18     The State argued that Alejandro, Viridiana, and J.D. were procedurally barred from challenging the court's 2013 paternity finding and Jaime must remain as J.D.'s legal father. The State asserted Alejandro failed to file an action to declare the nonexistence of a parent-child relationship within two years of learning he was J.D.'s biological father, as required by the Illinois Parentage Act of 2015 (Parentage Act) (750 ILCS 46/609(b) (West 2016)). Further, Alejandro knew about the 2013 child protection proceedings and failed to seek relief within the one-year limit imposed by the Juvenile Court Act of 1987 (Juvenile Court Act) (705 ILCS 405/2-32 (West 2016)) and the two-year limit imposed by the Code of Civil Procedure (735 ILCS 5/2-1401(c) (West 2016)). The State also argued J.D. and Viridiana failed to challenge the 2013 paternity finding within the statutorily required times, precluding them under principles of *res judicata* and collateral estoppel.

¶ 19     The public guardian countered that J.D. could petition to establish parentage in Alejandro because the 2013 proceeding did not formally or finally resolve the parentage issue. The trial court had merely taken judicial notice of Jaime's VAP in 2013, and the Parentage Act prohibits courts from ratifying a VAP. So no final order had been entered precluding J.D.'s ability to establish parentage in Alejandro. Moreover, equity requires that J.D. be able to challenge the VAP and establish parentage in Alejandro, given Alejandro was not a party to the 2013

5

proceeding, and J.D. did not know Alejandro was his biological father until the court-ordered 2017 paternity test. Alternatively, the public guardian asked that J.D. be allowed to request a paternity finding in Alejandro at a later date, after J.D. had therapy, which would help in resolving the issue of paternity in his best interests, and Alejandro remain a party regardless of his legal paternity status.

¶ 20        Alejandro argued the trial court should enter an order naming him as J.D.'s legal father. He asserted the Parentage Act did not bar him from challenging the nonexistence of a parent-child relationship between Jaime and J.D. because Viridiana "fraudulently concealed" his having fathered J.D. by telling Alejandro she got an abortion. Besides, he had no knowledge of the 2013 case.

¶ 21        The trial court recognized Jaime as J.D.'s father and rejected the public guardian's suggestion to apply a best interest standard to its paternity finding, noting the supreme court rejected that standard for a minor's paternity in *In re A.A.*, 2015 IL 118605, ¶ 27. After summarizing the evidence, the court ruled that the Parentage Act's two year statute of limitations barred Alejandro but not J.D. from challenging the 2013 paternity finding. But, the court found the doctrines of *res judicata*, collateral estoppel, and the law of the case barred J.D.'s petition. The court held the parentage finding in the 2013 proceeding constituted a final judgment on the merits and was not a ratification of Jaime's VAP. In addition, the public guardian waived J.D.'s objection by not raising it at the time. The trial court denied the public guardian's request that Alejandro remain a party and dismissed him. The court then entered a new parentage order finding that Jaime was J.D.'s father.

¶ 22        J.D., Viridiana, and Alejandro filed separate notices of appeal. The appeals were consolidated, and Viridiana and Alejandro filed briefs adopting J.D.'s arguments.

¶ 23                                    II. Analysis

¶ 24                              A. Statute of Limitations

¶ 25         J.D. argues the trial court correctly found the statute of limitations did not bar him from filing his petition. The State claims the petition was untimely, relying on section 205(b) of the Parentage Act 750 ILCS 46/205(b) (West 2016)), rather than section 609 of the Parentage Act (*id*. § 609). But section 205 applies to causes of action to disestablish parentage, not to establish parentage. Accordingly, we agree with J.D. that section 609 applies. And, as section 609 does not contain a limitations period for a child trying to establish parentage, J.D.'s petition cannot be dismissed on that basis.

¶ 26         We now turn to the primary issue—whether the preclusive doctrines of *res judicata* and collateral estoppel apply.

¶ 27                               B. *Res Judicata*

¶ 28         The equitable principle of *res judicata* prevents a multiplicity of lawsuits between the same parties involving the same facts and issues. *Quintas v. Asset Management Group, Inc.*, 395 Ill. App. 3d 324, 328 (2009). A *res judicata* issue presents a question of law, which we review *de novo*. *Arvia v. Madigan*, 209 Ill. 2d 520, 526 (2004).

¶ 29         Three requirements must be met: (i) a final judgment on the merits made by a court of competent jurisdiction, (ii) identity of causes of action, and (iii) identity of parties or their privies in the lawsuits. *Hudson v. City of Chicago*, 228 Ill. 2d 462, 467 (2008). Once all three prerequisites have been satisfied, *res judicata* "bars not only what was actually decided in the first action but also whatever could have been decided." *Id.* "[T]he facts as they exist at the time of judgment determine whether *res judicata* bars a subsequent action."  (Emphasis and internal quotation marks omitted.) *Doe v. Gleicher*, 393 Ill. App. 3d 31, 39 (2009). *Res judicata* should

be applied as fairness and justice require and only to facts and conditions as they existed at the time judgment was entered. *Carey v. Neal, Cortina & Associates*, 216 Ill. App. 3d 51, 64 (1991). Courts must be cautious in applying *res judicata* in child custody cases, and give the welfare of the child paramount consideration. *In re Marriage of Fields*, 283 Ill. App. 3d 894, 901-02 (1996).

¶ 30                                  1. Final Judgment on the Merits

¶ 31        The State recognizes that usually a paternity order is not a final order because matters remain in dispute. See *People ex rel. Hughes v. Walker*, 278 Ill. App. 3d 116, 118 (1996). Despite this acknowledgement, the State claims the paternity order in the 2013 proceeding became a final judgment on the merits by its incorporation into the disposition order on Jaime's and Viridiana's unfitness to parent the children. We disagree.

¶ 32        The case the State cites to support its contention involves dissolution of marriage proceedings in which paternity was an issue and the judgment directly involved that issue. *Gay ex rel. Gay v. Dunlap*, 279 Ill. App. 3d 140, 144 (1996) ("A paternity ruling is not final for purposes of appeal until the circuit court has ruled on requested relief which is directly tied to a finding of paternity, such as child support and birth expenses." (Internal quotation marks omitted.)). Although we agree with the State that paternity can be an issue in adjudication of wardship proceedings, the 2013 proceeding arose from an altogether different issue. The parties came before the court after allegations of child mistreatment. A paternity test showed that Jaime was not J.D.'s father; nevertheless, the public guardian decided not to disestablish parentage in Jaime, which would essentially make J.D. fatherless.

¶ 33        Later, at the adjudicatory hearing, Viridiana identified Alejandro as J.D.'s father. Alejandro was not a party at that time, and although the trial court asked the caseworker to locate

8

Alejandro, he never received proper notice of the proceeding. The trial judge, noting the importance to the children in finalizing the case, stated the parentage issue would be revisited if Alejandro appeared but it was "not in the best interests of these three minors *** to delay adjudication pending what at this point is speculation that [Alejandro] would come to court." So in finding that J.D. and his siblings were neglected due to an injurious environment, the trial judge left open the parentage issue, and the public guardian had a reasonable basis not to challenge the parentage finding—Alejandro was not present and J.D.'s current best interests were served by Jaime's continuation as J.D.'s legal father.

¶ 34        The dissent argues the parentage finding in the 2013 proceeding should be given preclusive effect, pointing to *In re Parentage of Griesmeyer*, 302 Ill. App. 3d 905 (1998). *Griesmeyer* involved a parentage finding in the context of a divorce proceeding in which the public guardian represented the child. Later, *res judicata* and collateral estoppel were applied to bar the child from relitigating the parentage issue. *Griesmeyer*, however, is readily distinguishable; it involved dissolution of marriage proceeding in which parentage took center stage and the court made a definitive parentage finding. As the appellate court stated, "the issue of the minor's paternity began as a dispute *** and ended as an uncontested judicial finding." *Id.* at 915. Under those circumstances, "to exclude the minor as a nonparty or nonprivy of the dissolution judgment where the minor was represented by a court-appointed guardian *ad litem* renders such legal representation a nullity." *Id.*

¶ 35        Here, no final paternity finding has been entered that would bar J.D. from raising it later. Indeed, the trial judge stated it "would be glad to entertain *** [Alejandro] participating in the proceedings, and if necessary, re-adjudicate [the] proceedings." Alejandro is now a party.

¶ 36                                2. Identity of Causes of Action

¶ 37    J.D. next argues there is no identity of causes of action. Illinois courts use the transactional test to decide whether causes of action are the same for *res judicata* purposes. *River Park Inc. v. City of Highland Park*, 184 Ill. 2d 290, 310 (1998). Under this test, separate claims will be considered the same for purposes of *res judicata* where they arise from a single group of operative facts, regardless of whether the causes seek different theories of relief. *Id.* at 311. "Where the same factual allegations form the basis for the two allegedly different causes of action, the fact that a party proceeds on different theories or seeks different relief does not prevent the operation of *res judicata*." *Best Coin-Op, Inc. v. Paul F. Ilg Supply Co.*, 189 Ill. App. 3d 638, 652 (1989) (citing *Barth v. Reagan*, 146 Ill. App. 3d 1058, 1066 (1986)). See *Singer v. Brookman*, 217 Ill. App. 3d 870, 877 (1991) ("Plaintiffs' actions are really just a different means to the same end and are identical for purposes of *res judicata*.").

¶ 38    J.D. disputes an identity of causes of action exists as the 2017 proceeding seeks to challenge the VAP and establish parentage in Alejandro, who was not a party or served and given official notice of the 2013 proceeding. And, in the 2013 proceeding, the trial court merely took notice of the VAP and did not address whether Alejandro was J.D.'s father. The State argues the 2013 and 2017 child protection proceedings arise from the same set of operative facts.

¶ 39    While J.D. attempts to differentiate the two proceedings, in both the question of J.D.'s biological father was raised. But significantly, the 2013 proceeding at no time addressed whether Alejandro was J.D.'s father. Accordingly, the operative facts are not the same, and no identity of causes of action exists.

¶ 40                          3. Identity of Parties or Privity

¶ 41    Lastly, *res judicata* requires an identity of parties or privity. Privity exists between parties who adequately represent the same legal interests. *People ex rel. Burris v. Progressive Land*

*Developers, Inc.*, 151 Ill. 2d 285, 296 (1992). The identity of interest, not the nominal identity of the parties, controls. *Indian Harbor Insurance Co. v. MMT Demolition, Inc.*, 2014 IL App (1st) 131734, ¶ 41.

¶ 42     The State contends that even if Alejandro was not in privity with Viridiana or J.D., equities support a finding that this requirement has been met because Alejandro knew he was J.D's father and knew of the 2013 proceedings but elected not to participate. The State also contends *Griesmeyer* supports a finding that *res judicata* bars Alejandro from challenging the paternity finding. Specifically, the State argues that J.D., as a party to the 2013 proceeding represented by the public guardian, could have challenged the paternity finding. And, consequently, relitigating the paternity finding is barred.

¶ 43     Again, however, Alejandro was not a party to that proceeding, and although the public guardian could have asked that Alejandro be named the father, the trial court indicated it would reconsider that issue should Alejandro appear. Thus, under the circumstances and given that J.D.'s best interests were served by Jaime continuing to be recognized as his father, the public guardian did not have reason at the time to challenge the paternity finding. Thus, because Alejandro was not a party to the 2013 proceeding, an identity of parties did not exist. As a result, J.D.'s petition is not barred by the *res judicata* doctrine.

¶ 44                                      C. Collateral Estoppel

¶ 45     Collateral estoppel is an equitable doctrine that precludes a party from relitigating an issue decided in an earlier proceeding. *American Family Mutual Insurance Co. v. Savickas*, 193 Ill. 2d 378, 387 (2000). The doctrine promotes judicial economy and prevents repetitive litigation. *Bickel v. Subway Development of Chicagoland, Inc.*, 354 Ill. App. 3d 1090, 1102 (2004). The threshold requirements are (i) the issue presented in the earlier case must be identical

11

to the one presented in the current case, (ii) the earlier case must have received final judgment on the merits, and (iii) the party against whom estoppel is asserted must have been a party or must have been in privity with a party in the earlier case. *Savickas*, 193 Ill. 2d at 387. Moreover, the application of the doctrine must not result in any unfairness to the estopped parties; they must have had a full and fair opportunity and incentive to present their case in the earlier suit. *Id.* at 388.

¶ 46 Application of the doctrine of collateral estoppel must be narrowly tailored to fit the precise facts and issues adjudicated earlier. *Nowak v. St. Rita High School*, 197 Ill. 2d 381, 390-91 (2001). Even after satisfying the threshold criteria, collateral estoppel will not available if it prevents parties from presenting their claims or defenses "unless it clear that no unfairness results to the" estopped party. *Id.* at 391. In deciding whether the doctrine of collateral estoppel applies in a particular situation, the court balances the need to limit litigation against the right of a fair adversary proceeding in which a party may fully present his or her case. *Id.* Whether a party has had a full and fair opportunity to litigate an issue in an earlier action depends on those elements comprising the practical realities of the litigation. *Id.*

¶ 47 Collateral estoppel does not bar J.D. from establishing parentage in Alejandro because the trial court did not enter a final judgment on the merits of the parentage issue in the 2013 proceeding. We agree with J.D.'s contention that it would be unfair to preclude him from establishing parentage in Alejandro given that Alejandro did not have the opportunity to do so in 2013, as the State did not notify him of the proceeding and he was not a party.

¶ 48 The dissent cites to *In re A.A.*, in which our supreme court held that "[a]n action brought under the Parentage Act on behalf of a minor to declare the nonexistence of a parent and child relationship does not provide for the court to consider the best interests of the child prior to

12

granting the petition." 2015 IL 118605, ¶ 27. The dissent contends the entire premise for the public guardian's effort to establish parentage in Alejandro invokes J.D.'s best interests. But, as noted, courts carefully apply the equitable doctrine of *res judicata* in child custody cases. *In re Marriage of Fields*, 283 Ill. App. 3d at 901-02. The equities favor allowing J.D., who was 4 or 5 years old during the 2013 proceeding and did not know Alejandro to be his biological father, to file a petition to establish parentage in Alejandro. That what is equitable also happens to align with what the public guardian deems in J.D.'s best interest does not constitute disregard for the supreme court's holding in *In re A.A.*, 2015 IL 118605.

¶ 49     At oral arguments, the public guardian said that J.D. has a good relationship with both Alejandro and Jaime and loves both of them. Although this suggests Alejandro has been a presence in J.D.'s life, the record lacks evidence regarding the nature of Alejandro and J.D.'s relationship. And the record does not support the dissent's assertion that Alejandro has failed to "step up to the plate" and "did not establish a relationship with him, contribute to his support, or take on any of the other responsibilities of a parent." We do not know one way or the other. More pertinent, the nature of their relationship has no relevance to the issue before us—whether collateral estoppel or *res judicata* bar J.D. from filing a petition to establish parentage.

¶ 50     In view of our decision, we need not address J.D.s' request to allow Alejandro to remain a party.

¶ 51     We reverse the trial court's order denying the petition and remand for further proceedings.

¶ 52     Reversed and remanded.

¶ 53     PRESIDING JUSTICE MASON, concurring in part and dissenting in part:

¶ 54        In *In re A.A.*, our supreme court held that, based on the "clear and unambiguous" language of the statute, "[a]n action brought under the Parentage Act on behalf of a minor to declare the nonexistence of a parent and child relationship does not provide for the court to consider the best interests of the child prior to granting the petition." 2015 IL 118605, ¶ 27. By the same token, no language in the Parentage Act requires consideration of a child's best interests in the context of a petition to establish parentage. *Id.* ¶ 31. The public guardian's effort to establish parentage in Alejandro (and, necessarily, to declare the nonexistence of a parent-child relationship between J.D. and Jaime) is premised entirely on J.D.'s best interests and ignores the procedural bars of *res judicata* and collateral estoppel. Because J.D. (i) had a full and fair opportunity to litigate the issue of parentage in the 2013 proceedings, (ii) refrained, through his guardian *ad litem* (GAL), from disputing Jaime's status as his legal father, and (iii) consented to the entry of a final adjudication incorporating that parentage finding, he is now precluded from pursuing his effort to establish parentage in another. I would affirm the trial court's determination on this issue and, accordingly, I respectfully dissent.

¶ 55        I concur in the majority's conclusion that J.D. is not time-barred from pursuing relief, although as I discuss, the issue is debatable. When there are several limitations periods potentially applicable to a claim, a court will select the one most tailored to the circumstances of the case. See *Newell v. Newell*, 406 Ill. App. 3d 1046, 1049 (2011) ("Where two statutes of limitations arguably relate to the same cause of action, the statute that more specifically relates to the action must be applied."). The State argues that, under either the one-year period allowed for challenging final orders under the Juvenile Court Act (705 ILCS 405/2-32 (West 2016)) or the two-year period for seeking relief from final judgments under the Code of Civil Procedure (735 ILCS 5/2-1401(c) (West 2016)), J.D.'s motion seeking to establish parentage in Alejandro, filed

more than three years after the final order entered in the 2013 proceedings, is untimely. But the Parentage Act addresses the specific claim asserted here—a request to establish parentage—and the legislature has specifically exempted minors from the two-year time limit for pursuing such claims set forth in section 609. 750 ILCS 46/609(b) (West 2016).

¶ 56     That said, the determination of the timeliness of J.D.'s petition is not necessarily straightforward. Under section 205 of the Parentage Act, proceedings to declare the nonexistence of a parent-child relationship, including those brought by the child, must be commenced within two years after the child "knew or should have known of the relevant facts." *Id*. § 205(b) (West 2016). Certainly by 2014, when 2013 DNA tests had shown that Jaime was not J.D.'s biological father and Viridiana testified under oath that Alejandro was the father, the GAL was in possession of sufficient facts to declare the nonexistence of the parent-child relationship between J.D. and Jaime. At oral argument, the public guardian took great pains to emphasize that the petition filed by J.D. in the 2017 proceedings sought to *establish* parentage in Alejandro under section 609 and that it was not a petition to *disestablish* parentage in Jaime under section 205. Casting the petition in this light allows J.D. to invoke the lack of any limitations period in section 609, while avoiding what would likely be a successful motion to dismiss any petition filed under section 205 as untimely. But establishing parentage in Alejandro and disestablishing parentage in Jaime are two sides of the same coin. Because Jaime's status as J.D.'s legal father has already been determined (a determination that, under the Parentage Act, has "the full force and effect of a judgment" (*id*. § 305(b)), J.D.'s petition to establish parentage in Alejandro necessarily requires disestablishment of parentage in Jaime, for J.D. cannot have two legal fathers. It could certainly be argued, as the State does, that when parentage in one individual has already been established, the timeliness of a child's petition that would undo that relationship must be

15

measured under section 205(a). But no case has addressed this particular issue and come to this conclusion, so I am willing to give J.D. the benefit of the doubt and agree that his petition is not time-barred.

¶ 57    I part ways with the majority, however, in the analysis of the preclusive doctrines of *res judicata* and collateral estoppel.

¶ 58    Before discussing the application of claim (*res judicata*) or issue (collateral estoppel) preclusion to J.D.'s motion filed in the trial court, it is important to define what issues we are called upon to decide. In particular, although Viridiana and Alejandro have joined in the brief on appeal filed on J.D.'s behalf, they are both time-barred from pursuing relief in their own right. As for Viridiana (and Jaime, for that matter), as a signatory to the VAP, she had two years to challenge it, but only on the basis of fraud, duress, or material mistake of fact. 750 ILCS 46/309(a), 609(a) (West 2016). Obviously, since Viridiana (i) signed the VAP on J.D.'s birth in 2008, (ii) knew, at least by 2010, that Alejandro had taken a home DNA test that showed he was the biological father, and (iii) did not seek to challenge the VAP at any time, her ability to pursue a parentage finding in Alejandro is time-barred and her position here necessarily derives from whatever rights her son has. By the same token, Alejandro, as a nonsignatory to the VAP, cannot seek to establish a father-son relationship with J.D. because Alejandro was obligated to commence a proceeding not later than two years after the VAP became effective in 2008. *Id.* /§ 609(b). The public guardian concedes as much. Accordingly, because neither Viridiana nor Alejandro has any independent right at stake, the focus must be on whether, in the 2013 proceedings, there was a final determination of paternity that precludes J.D. from re-litigating the issue now.

¶ 59    It is also important to articulate why, in the context of J.D.'s petition to establish parentage in Alejandro, we do not consider J.D.'s best interests. As the court explained in *In re A.A.*, "[T]he Parentage Act 'contains no express requirement that a court consider the best interests of the child before any *** legal determination of paternity is made.' [Citation.] Instead the first step in the proceeding is to establish or disestablish parentage." 2015 IL 118605, ¶ 31 (quoting *In re Parentage of John M.*, 212 Ill. 2d 253, 264-65 (2004)). It is only when parentage has been established that "the trial court is charged with the responsibility of deciding other issues which surround paternity, including custody and visitation, where the best interests of the child are of paramount concern." *Id.* This is why the public guardian's reliance on *In re Marriage of Fields*, 283 Ill. App. 3d at 902 (trial courts should "use caution" in determining when to apply *res judicata* in child custody cases, as " 'the most important consideration is the welfare of the child' " (quoting *In re Marriage of Weaver*, 228 Ill. App. 3d 609, 616 (1992))), misses the mark. This case does not involve a "child custody" determination and the "most important consideration" is not whether a declaration of parentage in Alejandro is in J.D.'s best interests. Rather, we are called upon to determine the legal effect of the parentage determination in the 2013 proceedings and whether J.D. can now challenge that determination.

¶ 60    J.D. argues that the parentage determination in the 2013 proceedings cannot give rise to either *res judicata* or collateral estoppel because under the Parentage Act, the court simply took judicial notice of the VAP so that there was no actual litigation of the parentage issue and, thus, there could be no "final order" for purposes of either preclusive doctrine. Although the majority does not explicitly embrace this reasoning, unsupported as it is by any authority, it is directly contrary to the language of the statute under which (i) a VAP is "equivalent to an adjudication of parentage" and (ii) parentage established pursuant to a VAP "has the full force and effect of a

17

judgment." 750 ILCS 46/305(a), (b) (West 2016). The legal effect afforded a validly executed and unchallenged VAP *is* a determination of parentage, unless and until overturned by a court. And once a VAP serves as the basis for a finding of parentage underlying a final order, it gives rise to preclusion just as any other determination of paternity would. See *In re A.A.*, 2015 IL 118605, ¶ 22 (under Parentage Act, father-son relationship may be established "by presumption (750 ILCS 45/5a (West 2012)); by consent (750 ILCS 45/6 (West 2012)); or by judicial determination (750 ILCS 45/7 (West 2012))"). The trial court was not merely taking judicial notice of the VAP in determining that Jaime was J.D's legal father; rather it gave the VAP the legal effect mandated by the Parentage Act, as it would any other method of establishing parentage. Indeed, had the trial court not determined that Jaime was J.D.'s legal father or had it made a finding of nonpaternity, it is unclear on what basis it could have entered *any* adjudication order against Jaime. For example, I am unaware of any provision of the Juvenile Court Act that permits a court to order a person who is not a parent, legal guardian, or legal custodian of a child to engage in parenting classes, anger management counseling, drug treatment, or any other services aimed at the goal of correcting the conditions that prompted the filing of the petition. See 705 ILCS 405/2-22(6) (West 2016) (referring to admonishments to "parents, guardian, custodian or responsible relative" regarding need to comply with terms of service plans); *id*. § 2-23(a) (dispositional order shall order "the parent, parents, guardian or legal custodian" to comply with terms of aftercare plan). Thus, because the parentage finding was essential both to the adjudication order and to the final disposition order entered in the 2013 proceedings, I reject the public guardian's effort to characterize the VAP's effect as purely ministerial.

¶ 61        And the trial court's finding of parentage in the 2013 proceedings was not limited to affording the VAP its required legal effect. Long before Viridiana appeared in the 2013 case and

identified Alejandro as J.D.'s father, the court was aware that DNA test results excluded Jaime as J.D.'s biological father. During a hearing on June 10, 2013, the court, after noting that "there are plenty of appellate cases that indicate that once the presumption of paternity has been established, it's not necessarily overcome by DNA testing years later," indicated that it wanted more information regarding the support order entered against Jaime "before I rule *either way* on whether there should be a finding that [Jaime] is excluded as the father or a finding of paternity otherwise." At the next hearing, the court observed that it had "reserved a finding of paternity" pending receipt of information. The state's attorney advised the court that, according to her supervisor, "because the DNA test was negative," the court could find that Jaime was not J.D.'s father "[a]nd the Department of Human and Family Services will honor that order." Acknowledging the state's attorney's position, the court did not believe it would be "appropriate" to make a finding of nonpaternity given that Jaime had not sought such a finding and "no one else has stepped forward" to claim paternity. The court then entered a finding of paternity indicating that Jaime "is, in fact, the father, because legally he is." And the court adhered to this finding even after Viridiana named J.D.'s biological father.

¶ 62    The majority reasons that because paternity was not the primary issue in the 2013 proceedings, the paternity finding incorporated into the adjudication order should not be given preclusive effect. *Supra* ¶ 32. Certainly, no one challenged the VAP in the 2013 proceedings and, in that sense, it is fair to say parentage was not a primary issue. But *res judicata* and collateral estoppel do not distinguish between primary and secondary issues and afford preclusive effect only to the former and not the latter. Under *res judicata*, judgments are final as to all matters that were *or could have been raised* in the earlier proceedings. See *Hudson*, 228 Ill. 2d at 467 ("*Res judicata* bars not only what was actually decided in the first action but also whatever could

19

have been decided."); *Pepper Construction Co. v. Palmolive Tower Condominiums, LLC*, 2016 IL App (1st) 142754, ¶ 73. And parties are collaterally stopped from re-litigating issues that were actually decided in earlier litigation. *Groves of Palatine Condominium Ass'n v. Walsh Construction Co.*, 2017 IL App (1st) 161036, ¶ 53. As discussed above, J.D.'s parentage—the claim common to both the 2013 and 2017 proceedings—clearly was raised and decided by the trial court during the 2013 proceedings, and the public guardian could have, but did not pursue establishment of parentage in Alejandro before a final order was entered in that case. So it does not matter under which doctrine the issue is analyzed, the result is the same.

¶ 63    The majority concludes that the adjudication order entered in the 2013 proceedings, which included the finding that Jaime was J.D.'s legal father, was not a final order for purposes of *res judicata* or collateral estoppel. Although the parties agree that the parentage finding made earlier in the case was not in itself a final order, I fail to see how the adjudication order incorporating the parentage finding, which became final upon entry of the disposition order, was anything other than a binding determination of parentage. It was entered after the court (i) heard a stipulation regarding Jaime's abuse of his daughter and (ii) found that the State has sustained its burden to demonstrate that Jaime's conduct posed a substantial risk of injury to his daughter and created an environment injurious to the other minors. And the adjudication order was appealable under the Juvenile Court Act as a step in the progression of the case to the final disposition order. *In re Leona W.*, 228 Ill. 2d 439, 456 (2008) (disposition order appealable as of right); *In re D.R.*, 354 Ill. App. 3d 468, 474 (2004) (adjudicatory order in a juvenile case reviewable on appeal from disposition order).

¶ 64    *In re Griesmeyer*, 302 Ill. App. 3d 905, supports the conclusion that the parentage finding entered in the 2013 proceedings should be given preclusive effect. In *Griesmeyer*, a husband and

wife were involved in dissolution of marriage proceedings. They had one child born during the marriage. In her petition for dissolution, the wife denied that her husband was the minor's father. In light of that allegation, the court appointed a GAL to represent the interests of the minor. The couple eventually agreed to and the trial court entered an uncontested judgment for dissolution, which included a finding by the court that the minor was " 'born as a result of this marriage.' " *Id.* at 906. Some 20 months later, the wife filed a parentage petition seeking to establish a father-child relationship between her current husband, who she claimed was the biological father, and the minor. Her ex-husband filed a motion to dismiss, invoking collateral estoppel to bar relitigation of the identity of the minor's father. The ex-husband argued that the position taken by the minor through his GAL during the dissolution proceedings, coupled with the findings incorporated into the agreed judgment of dissolution, precluded the wife's effort to revisit the issue.

¶ 65 The court first addressed the significance of the appointment of a GAL for the minor in the dissolution proceedings, noting that the case presented circumstances predicted by the special concurrence in *Simcox v. Simcox*, 131 Ill. 2d 491, 499 (1989). "The duty of a guardian *ad litem* is 'to call the rights of the minor to the attention of the court, to present their interests and claim for them such protections as under the law they are entitled.' " *In re Griesmeyer*, 302 Ill. App. 3d at 914 (quoting *Rom v. Gephart*, 30 Ill. App. 2d 199, 208 (1961)). A GAL's guiding principal is to act in the best interests of the minor. *Id.* The court noted that a paternity determination "is not *always* in the best interests of the child" and a GAL's decision to pursue or refrain from pursuing paternity "necessarily must rest on myriad factors that cannot be encompassed in one *per se* rule of law, but instead must be decided on a case-by-case basis." *Id.*

¶ 66    As to the case before it, the *Griesmeyer* court concluded that the parentage of the minor was "clearly raised" in the dissolution proceedings and was later resolved by the marital settlement agreement, which was incorporated into the judgment of dissolution. *Id.* at 915. *Griesmeyer* held:

> "[T]he issue of the minor's paternity began as a dispute, continued through the legal process with the minor represented by a guardian *as litem*, and ended as an uncontested judicial finding. Under these circumstances, to exclude the minor as a nonparty or nonprivy of the dissolution judgment where the minor was represented by a court-appointed guardian *ad litem* renders such legal representations a nullity." *Id.*

The court ultimately determined that that relitigation of the minor's paternity in his mother's parentage petition was barred. The fact that the wife's current husband was not a party to the earlier marital dissolution proceeding did not prevent the prior judgment from having preclusive effect.

¶ 67    *Griesmeyer*'s reasoning warrants the same result here. There is no question that J.D. was a party to the 2013 dependency proceedings through his appointed GAL whose "guiding principal" was to act in his best interests. When DNA testing conducted in 2013 excluded Jaime, the alleged perpetrator of the abuse of his daughter, as J.D.'s father, and Viridiana testified under oath in 2014 that Alejandro was J.D.'s biological father, J.D.'s GAL was clearly faced with the question of whether it was in J.D.'s best interests to pursue disestablishment of the father-son relationship between J.D. and Jaime and request that the State join Alejandro as a party in order to establish parentage in him. And because that was the GAL's choice to make on J.D.'s behalf, J.D. cannot rely on the lack of notice to Alejandro or the State's failure to join him as a basis to relitigate parentage. In other words, it was not incumbent upon the State, in the face of the trial

22

court's earlier parentage determination (which the court was not inclined to revisit), to join as a party an individual the GAL expressed no interest in pursuing.

¶ 68    The majority relies on certain statements made by the trial judge in connection with the adjudication entered in the 2013 proceedings as indicating that the judge did not believe he was entering a final order as to parentage. *Supra* ¶ 34. But as noted, once the disposition order was entered, the adjudication order was appealable under the Juvenile Court Act, so what the trial judge said when entering the earlier order is irrelevant. And even if the GAL could have interpreted the court's comments as indicating a willingness to leave paternity as an open issue in the 2013 case, the GAL could not have harbored that understanding once the final order was entered and the case was closed.

¶ 69    Further, considering the trial judge's comments in context, I disagree that the he left the door open or that the public guardian reserved the right to revisit the parentage issue at some undefined future date. After noting its previous finding that Jaime was J.D.'s father and its disinclination to vacate any finding of paternity even after DNA test results showed they were not biologically related, the court observed that relevant time limits under the Parentage Act would likely foreclose any challenge to the VAP. And while the court welcomed Viridiana's return from Mexico and her willingness to identify J.D.'s biological father, the trial judge never indicated that Alejandro's absence had any impact on his ability to proceed with adjudication: "[T]he Court does have jurisdiction over the parties and the subject matter; and we can proceed with the Adjudication Hearing today." As to the possibility that Alejandro might one day surface, the court commented:

> "If it turns out there is another person who is the biological father; and, if that person
>
> were to come to court on a later court date and wish to participate in the proceedings, I'd

23

cross that bridge when we came to it; and I have no problem with that person having notice, but this case has been pending before the Court since April 18th. *There is no question that [Jaime] is the legal father of [J.D.] regardless of who the biological father is ***.*" (Emphasis added.)

And after the court heard testimony from Viridiana identifying Alejandro, including his date of birth, the fact that he lived in Chicago, and that she could communicate with him via e-mail, the court made clear that those circumstances did not warrant postponing adjudication:

"*if* it's necessary, on a future court date *if* there is some reason to believe that [Alejandro] would have standing before the Court, I would be glad to entertain even his participating in the proceedings; and *if necessary*, readjudicate the proceedings; but the Court at this time believes it's not in the best interests of these three minors whose cases have been pending since April to delay adjudication." (Emphasis added.)

¶ 70    Following Viridiana's testimony and after expressing agreement with the stipulation incorporating the court's finding that Jaime was J.D.'s father, J.D.'s GAL did not inform the court that she believed the paternity determination was anything other than final, nor did she purport to reserve the right to further pursue the issue in the future. And, as it turns out, Alejandro never did come to court or express any desire to participate in the 2013 proceedings prior to time the case was closed on June 24, 2015.

¶ 71    There are multiple considerations that would have warranted a determination by J.D.'s GAL that pursuing further litigation regarding J.D's parentage in the 2013 proceedings was not in her client's best interests. See *In re Custody of D.A.*, 201 Ill. App. 3d 810, 822-23 (1990) (GAL need not bring paternity action where such action would not be in minor's best interests). First, consistent with the trial court's observations, it was not in any of the minors' interests to

delay adjudication given that the case had been pending for nine months. See 705 ILCS 405/2-14(a) (West 2016) ("serious delay in the adjudication of abuse, neglect or dependency cases can cause grave harm to the minor and the family and that it frustrates the health, safety and best interests of the minor"). During the pendency of the case, J.D. and his sisters had been placed with Jaime's mother. The court was anxious to proceed to disposition so that DCFS could determine what services were necessary in order to return the children to their mother. Second, the sum total of what the parties knew about Alejandro was that, although he was aware, according to Viridiana, at least since 2010 that he was J.D.'s father, he had taken no action and shown no interest in becoming involved in J.D.'s life.[1] Finally, pursuit of parentage in Alejandro could have threatened to separate J.D. and his sisters, *i.e.*, the most stable and consistent relationships in J.D.'s life to date. Given that (i) on the spectrum of child abuse, Jaime's conduct in striking his daughter once with a hanger was toward the less heinous end of the scale[2] and (ii) no one had ever accused Jaime of abusing J.D., J.D.'s GAL was justified in refraining from objecting to parentage in Jaime or further pursuing parentage in Alejandro at any time before disposition of the 2013 proceedings.

¶ 72    Further, contrary to the public guardian's position here, the choice J.D's GAL faced in 2014 was not between allowing the finding of parentage in J.D. to stand or pursuing a petition to disestablish parentage, leaving J.D. fatherless. Clearly, once information regarding Alejandro surfaced, the GAL could have insisted that he be joined as party by the State and pursued a finding of parentage, just as J.D. is now attempting to do. The fact that J.D.'s GAL refrained

---

[1] Indeed, the public guardian continues to recognize that establishing parentage in Alejandro may ultimately not be in J.D.'s interests as evidenced by the "primary" position taken on J.D.'s behalf in the trial court, *i.e.*, that the court should do nothing until the parties had had an opportunity to explore the issue.

[2] Although the court found that Jaime's stipulated conduct constituted abuse, it declined to find that it satisfied the more serious allegation of excessive corporal punishment.

from pursuing that very available course of action in the 2013 proceedings reflects a conscious decision that she did not believe it was in her client's best interests.

¶ 73    I believe the parentage finding made by the court in the 2013 proceedings satisfies all the prerequisites to invocation of both *res judicata* and collateral estoppel. There was a determination on the merits of J.D.'s parentage entitled to the "full force and effect of a judgment" under the Parentage Act under circumstances where J.D.'s best interests were represented through his court-appointed GAL.

¶ 74    The public guardian argues that equitable considerations implicated by *res judicata* and collateral estoppel should counsel against a finding that J.D. is precluded from litigating parentage. See, *e.g.*, *Pepper Construction Co.*, 2016 IL App (1st) 142754, ¶ 76 ("Even where the threshold elements of collateral estoppel are satisfied, the doctrine should not be applied to preclude a party's claims or defenses unless it is clear that no unfairness results to the party being estopped." (citing *Nowak*, 197 Ill. 2d at 391)). But the only equitable consideration the public guardian articulates is the unfairness of not allowing J.D. to establish parentage in a man everyone acknowledges is his biological father. This is just an indirect way of allowing the best interests of the child to drive a parentage determination, contrary to *In re A.A.*'s mandate and the plain language of the statute.

¶ 75    This is not a situation where an adult decides to step up to the plate, albeit belatedly, to take responsibility for a child he fathered. Both the 2013 and 2017 proceedings were initiated on petitions filed by the State seeking to adjudicate the minors, including J.D., wards of the State because of allegations that their home environments were unsafe and injurious to their welfare. Before the 2013 proceedings were filed, as far as the record shows, Alejandro did nothing to fulfill his role as J.D.'s father: he did not establish a relationship with him, contribute to his

26

support, or take on any of the other responsibilities of a parent. Alejandro did not step forward when Viridiana, who had moved to Mexico with the three minors but later allowed them to return to the United States with Jaime, informed Alejandro of the 2013 proceedings in which it was determined that Jaime had inflicted injuries on one of his daughters, thus creating an injurious environment for all three children. After the charges against Jaime were substantiated during the 2013 proceedings, the minors were returned to Viridiana's custody. Again, there is no indication that for the next three years, Alejandro had any involvement in J.D.'s life. And but for the alleged assault on one of Jaime's daughters by Viridiana's boyfriend in 2017, prompting the filing of a new petition and the placement of the minors with Jaime, and the ensuing assault charges by Jaime's other daughter against him, which, in turn, prompted their foster placement, I find it hard to believe that Alejandro would ever have come forward. It is only by virtue of the unhappy circumstance that these children have twice found themselves the subject of dependency proceedings that the issue of J.D.'s parentage was ever raised.

¶ 76        On November 30, 2017, based on the results of the DNA testing,[3] the trial court allowed J.D., who is now 10 years old, supervised visitation with both Jaime and Alejandro. During oral argument, the public guardian commented that "our little guy loves both these men." I do not doubt that. Nothing in the trial court's order precluding J.D. from relitigating parentage prevents Alejandro from doing what he should have done when he discovered he was J.D.'s biological father in 2010. And while J.D. is free to establish a relationship with Alejandro and to simultaneously maintain his relationship with Jaime, I believe, as a matter of law, he must sadly do so outside the court system.

---

[3] The order requiring Alejandro to submit to DNA testing was not, as argued by the public guardian, an indication that the court believed parentage was an open issue. First, the order was entered in the assigned judge's absence by a judge unfamiliar with the history of the case. Second, requiring a DNA test was reasonable given that, had the test not confirmed Alejandro's paternity, his participation in the case would have been at an end.

¶ 77    Finally, given the bar to relitigating J.D.'s parentage, it necessarily follows that the trial court properly declined to allow Alejandro to remain a party in the case.

¶ 78    I would affirm the trial court's order in its entirety.